### FRANK B. ROGERS v. STATE.

No. A-1039.   Opinion Filed October 26, 1912.

(127 Pac. 365.)

1.   HOMICIDE—Self-Defense—Communicated Threats.   (a)   Where the issue of·self-defense is raised, and the defendant offers evidence of threats made by the deceased against him, which threats were communicated to the defendant prior to the homicide, such threats are admissible in evidence without first proving they were actually made by the deceased, upon the ground that a person is always justified in acting upon reasonable apprehension of danger, and that it is immaterial as to whether the danger is real or only apparent, provided only that he acts in good faith.   Morris v. Territory, 1 Okla. Cr. 617, 99 Pac. 760, 101 Pac. 111, and White v. State, 4 Okla. Cr. 157, 111 Pac. 1010, cited and reaffirmed.

(b)   Communicated threats are admissible in evidence for the purpose of showing the defendant's state of mind toward the deceased at the time of the homicide, and also to show the fact and reasonableness of defendant's apprehension of violence at the hands of the deceased. If, therefore, the defendant has received information from a reliable source that the deceased has threatened his life, or to inflict serious bodily injury upon him, the effect of this depends alone upon the information received, and, so far as the rights of appellant are concerned, it is immaterial as to whether or not the threats were actually made.

(c)   For a full discussion of the philosophy of the law of threats, whether communicated or uncommunicated, see opinion.

2.   HOMICIDE—Evidence—Res Gestae.   (a)   A defendant being on trial for murder, and the issue of self-defense having been raised by the testimony, it is error for the trial court to refuse to permit the defendant to prove that knucks and four knives were found in a pocket of the coat of the deceased after the fatal difficulty.

(b)   Where a fatal difficulty occurs, and a trial for murder ensues therefrom, as to whether or not deceased was armed during such difficulty is a part of the res gastate thereof, and may always be shown, either by the state or by the defense.

3.   CONTEMPT—Witnesses—Trial—Conduct of Counsel—Cross-Examination.   (a)   During the trial of a criminal case, it is improper for attorneys on one side or the other to make side-bar remarks reflecting on opposing counsel; and it is the duty of the trial court to promptly rebuke and suppress remarks of this kind, and, if persisted in, the offender should be punished for contempt of court.

(b)   In the examination or cross-examination of witnesses, it is highly improper for attorneys to ask questions which suggest unfair inferences, either on one side or the other, and such conduct should not be permitted by the trial court.

(c) Every defendant in a criminal case is entitled to fair treatment on his trial, and a prosecuting attorney should not be permitted to ask questions which he knows to be illegal for the purpose of prejudicing the defendant, or to make remarks in the examination of a witness which contain unfair reflections upon the defendant. In the examination of witnesses, he should confine himself exclusively to developing legal evidence against the defendant, and should reserve his comments on the testimony for his argument to the jury; and it is the duty of trial courts to rigidly enforce this rule.

4. WITNESSES—Cross-Examination. (a) On cross-examination, it is proper to inquire as to whether or not the witness was drinking intoxicating liquor at the time or shortly before the occurrence with reference to which he testifies.

(b) Where the state has placed a witness on the stand, in a case where the issue of self-defense is raised, who testified that he was with the deceased some time prior to the fatal difficulty, it is proper for the defendant to ask said witness on cross-examination as to whether or not the deceased drank any intoxicating liquor at this time.

(c) Where a party places a witness on the stand, who testifies to a transaction or part of a transaction, it is the right of the opposing side on cross-examination to bring out anything which may have happened during the time covered by the testimony of the witness given in his direct examination which had previously been omitted, and which would in any manner tend to shed light upon the transaction testified to.

(d) Where the state places a witness on the stand, who testifies to a certain transaction, it thereby voluntarily opens a door which it cannot arbitrarily close, until the defendant on cross-examination has brought out all the facts within the knowledge of such witness material to a thorough understanding of that part of the transaction which the state has proven.

5. HOMICIDE—Self-Defense—Evidence. (a) Where the issue of self-defense was raised by the testimony, it was error for the trial court to refuse to allow the appellant to prove that some time prior to the fatal difficulty he met the deceased on the public road, the deceased riding in a buggy and the appellant on horseback, and that the deceased jumped out of the buggy and rushed at appellant; that appellant turned his horse and attempted to run away, whereupon the deceased grabbed the tail of appellant's coat and hung onto it; and that in appellant's efforts to escape from deceased his coat tail was torn from his body and left in the hands of the deceased.

(b) Where the issue of self-defense is presented by the evidence, testimony of previous assaults, attacks, and attempts to injure the defendant by the deceased are admissible in evidence, and have far greater probative force than any threats made by the deceased against the defendant could have had. Sneed v. Territory, 16 Okla. 641, 86 Pac. 70, 8 Ann. Cas. 354, McHugh v. Territory, 17 Okla. 20, 86 Pac. 433, and Mulkey v. State, 5 Okla. Cr. 96, 113 Pac. 532, cited and reaffirmed. Kansas v. Scott, 24 Kan. 68, and Russell v. State, 11 Tex. App. 291, cited and approved.

6.    **HOMICIDE—Criminal Law—Self-Defense—Instruction.** (a) The following instruction is erroneous: ''Upon the other hand, gentlemen of the jury, before you would be justified in acquitting the defendant on the ground of self-defense, you ought to believe the defendant's cause of apprehension was reasonable. Whether the facts constituting such reasonable cause have been established by the evidence, you are to determine; and unless the facts constitut-. ing such reasonable cause have been established by the evidence in this case, you cannot acquit the defendant in such case on the ground of self-defense, even though you may believe that the defendant really thought he was in danger.''

(b)  It is not necessary for a jury to believe that a defendant's cause of apprehension of danger was reasonable before they can acquit him; neither is it necessary for them to find that his defense has been established by the evidence before they can acquit him. But it is their duty to find him not guilty if the entire evidence, whether offered by the state or defendant, leaves in their minds a reasonable doubt as to his guilt. A verdict of not guilty is not based upon a belief of innocence, but is required by law where there is a reasonable doubt of guilt.

(c)  In a case of murder, where the issue of self-defense is presented, the jury should be instructed that, in passing upon the questions as to whether or not the defendant acted upon reasonable apprehension of danger, they must view the facts and circumstances in evidence from the defendant's standpoint and as they then reasonably appeared to him.

7.    **TRIAL — Credibility of Witnesses—Instruction—Harmless Error.** (a)  To tell a jury that they are at liberty to disregard the testimony of a witness, who they believe has willfully testified falsely as to any material fact, except in so far as the same may be corroborated by other credible evidence, is to tell them that if they find such testimony has been corroborated they are bound to accept and act upon it, although they may still believe it to be untrue. Such instruction invades the province and right of the jury to be the sole judges of the credibility of the witnesses, and is therefore erroneous.

(b)  It is the settled rule of this court to disregard all immaterial and harmless errors, and to affirm convictions where the record shows that the appellant was fairly tried and legally proven to be guilty; but it would be an outrage on law and a prostitution of justice to affirm a conviction, where the record affirmatively shows that the defendant was not fairly tried, that competent and material evidence in his behalf was excluded, and that erroneous instructions covering the pivotal points in his case were given to the jury. The doctrine of harmless error can not be made to apply to such a case.

(Syllabus by the Court.)

*Appeal from District Court, Kay County;*
*W. M. Bowles, Judge.*

·  Frank B. Rogers was convicted of manslaughter, and appeals. Reversed.

P..M. Butler testified in behalf of the state: That he resided in Kay county, Okla. That he was acquainted with the deceased, Ed Conrad, in his lifetime. Deceased was a good-sized man, and weighed nearly 200 pounds, of medium height, and was in fairly good health. On the 28th day of February, 1910, deceased and witness were traveling east on the public road in Kay county, Okla., going toward a town called Hardy. While traveling on this road, they saw the defendant. Two men were with him. They were coming west with a wagon. Bill Hammond was driving the wagon, and defendant was on horseback. When they met, the deceased struck the defendant on his neck or jaw. Defendant was riding on the north side of the wagon, about even with the center of the front wheels. When deceased struck defendant, they were leaning over in their saddles pretty strong toward the south; that is, on the opposite side of which deceased was riding. Just after this, deceased swung his horse around, nearly facing the northeast. The horse upon which the defendant was riding stepped one or two steps west. Just as the defendant's horse started to turn, the first shot was fired. When the next shot was fired, the deceased and defendant were 30 or 40 feet apart. During the shooting, defendant approached the deceased a trifle after each shot. There were five shots in all. During the shooting, defendant said, "I will finish this," or "I will finish this now." The deceased said, "That is all right, Frank." Deceased also said to defendant, "You wouldn't get off your horse, would you?" After the shooting was over, witness and deceased went to the town of Hardy. After they had gone some distance two men took deceased and put him in a wagon.

Bije Jerome testified: That he resided in the town of Hardy, Kay county, Okla. That he remembered the circumstance of the shooting of deceased by defendant. That witness was in the wagon with Bill Hammond when the shooting occurred. Bill Hammond was driving the team. The wagon belonged to defendant. Rogers was riding by the front wheel of the wagon on horseback, on the north side of the wagon. About 2 o'clock the parties met the deceased and Mr. Butler, the state's witness. Butler and the deceased turned out of the road to the left and rode

up to the side of the wagon. Deceased drew back his fist and hit defendant on the neck or jaw. The horses of the two men parted. The first shot was then fired by the defendant. When the shooting was going on, the deceased held his hand out to defendant, and said, "That's all right! That's all right!" Deceased had nothing in his hand. Deceased also called defendant a "God damned son of a bitch," and told him to get down off his horse. There were five shots fired that witness knows of. After the shooting was over, defendant said that he hoped he had killed the son of a bitch.

William T. McKay testified for the state: That he was a physician and surgeon. That he saw the deceased after he was wounded. He had two gunshot wounds. One bullet entered about two inches above the center of the left groin, on the left side, and emerged about two inches to the right of the median line. The other ball entered about an inch and a half or two inches to the right of the spine. The deceased died from the effects of these wounds.

James George testified for the state: That he resided in Kay county, Okla. Witness met defendant on the day of the killing. Two men were in the wagon with some corn. After they had gone some distance, witness heard a shot. He looked around, and other shots were fired. All that witness could see was the smoke of the gun. The deceased and defendant appeared to be about 30 feet apart. Witness only heard three shots fired. After the shooting was over, Mr. Butler and the deceased caught up with witness in his wagon, and the deceased was taken into the wagon. This occurred in Kay county, state of Oklahoma.

Bryan Mowatt testified for the state: That he saw the deceased on the day of the difficulty, and went with deceased from the town of Hardy to the hospital at Arkansas City. He died in the hospital at Arkansas City.

Joseph Drake testified for appellant: That he was acquainted with defendant, and knew deceased in his lifetime. Witness saw the parties when they came together on the day of the fatal shooting. Witness saw a man ride up opposite defendant, and it looked as if he made a lick at defendant. Defendant fell over

to one side. Witness did not hear the shooting, or see any smoke, as he was some distance away.

Appellant testified: That he was acquainted with the deceased, and had known him about 20 years. In the latter part of December witness had a difficulty with deceased. On the morning of the shooting, defendant met Mart Butler and Ed Conrad, the deceased. Defendant was on horseback, and Hammond was driving the wagon. Defendant was riding on the north side of the wagon. When the defendant met deceased, he was traveling on the north side of the wagon. The general custom is that, when people meet a wagon they turn to the right. Deceased kept straight on to where defendant was; did not speak a word. When he got opposite defendant, he crowded defendant right into the horse, or between the horse and the front wheels of the wagon, and with an oath hit defendant in the neck, and knocked defendant over on the hip of the horse hitched to the wagon. The horse of witness jumped a little, and witness saw the deceased come back toward him, not more than seven or eight feet away from witness. Witness turned to deceased, and told him to stop; and deceased replied with an oath, and kept coming on after witness, and witness shot at him four times. The horses were moving while the shooting was going on. He shot because he was afraid deceased would kill him, and thought the deceased intended to do this. Deceased was a very large, strong, muscular man. Witness denied stating to Jerome that he hoped he had killed the son of a bitch, or words to this effect. Before the difficulty, witness had heard of threats made on the part of the deceased. After the shooting, witness surrendered.

Joseph Drake, recalled as a witness for the defendant, testified: That deceased said to witness he didn't want any trouble with him (witness), but that Rogers was the son of a bitch he wanted. That he heard deceased, speaking of Rogers, say that hell would be popping with him before long. Witness remonstrated with deceased, and deceased said, "Yes, there will be trouble, and serious trouble; somebody will get shot or cut to hell before long." This was about the 1st of February, before

the killing. Witness communicated these threats to defendant prior to the day of the difficulty.

Bob Atterbury testified for the defendant: That he knew the deceased in his lifetime. About six days prior to the difficulty, when the deceased was killed, witness heard deceased say, at a lumber yard at Hardy, Okla., "Why don't some of you boys beat hell out of Frank Rogers?" Witness replied, "That is only one man's job, and if you want him beat, you will have to do it yourself." Deceased run his right hand down in his right coat pocket, and pulled out a pair of knucks, and held them up, and said, "If I get a lick at the God damned son of a bitch, I will break his God damned neck." Witness replied, "Mr. Rogers told me that he didn't want any trouble with you, and there is no occasion for trouble;" and he replied, "Well, there will be trouble before I leave this country." Witness communicated this to defendant two or three days before the killing.

C. S. Fowler testified for the defendant: That he resided in Arkansas City. He was an undertaker. He took charge of the deceased after his death. Defendant offered to prove by this witness that a pair of knucks and four knives were taken from the wearing apparel of the deceased at the hospital at Arkansas City, and delivered to Mrs. Montgomery, a nurse at the hospital, and that these knives and knucks were delivered by this witness, or by Mr. Shaffer, to the wife of the deceased, and her receipt received therefor, and that the coat from which the knucks and knives were taken was the same coat that deceased had on at the time of the shooting. To all of which the prosecution objected, and the court excluded all of said testimony from the jury.

Oscar McKinney testified for the defendant: That he knew the deceased in his lifetime; was acquainted with the defendant. Witness saw the difficulty near the town of Hardy in which the deceased was shot. When the parties met in the road, deceased went to the right of the wagon, on the same side of the wagon that the defendant was on. When deceased approached the defendant, he made a long swing and struck the defendant somewhere in the neck. Conrad then turned his horse around, and started toward Rogers, and said something which witness did

not understand. As Conrad got his horse around, defendant said, "Ed, you had better stop!" but deceased went on toward Rogers, and did not stop, and Rogers pulled his gun and commenced shooting. He fired about as fast as a man could shoot. Witness was about 300 yards from the place of the shooting. A few days before the shooting, witness heard the deceased say, before he went away from there, he was going to give Frank Rogers a good beating; but he also said, "I think Frank Rogers is carrying a gun, but he ain't got any better gun than I have."

Will Hammond testified for the defendant: That he knew the deceased in his lifetime. That he was acquainted with the defendant. Witness was driving a wagon on the day of the shooting. The shooting took place about 2 o'clock. Rogers was riding by the side of the wagon, on the north side. That deceased and Mart Butler met them. There was not a word said. Deceased rode up by the side of Rogers and struck him on the neck. The blow knocked Rogers over on top of one of the horses to the wagon. This made the horse jump and break the harness. When Rogers fell over on top of the horse, he swung himself back in the saddle, and his horse jumped out and turned around. Conrad also turned his horse around. When deceased hit defendant, he called him a son of a bitch. They then both turned around, and Rogers told Conrad to stop. Conrad moved his horse up toward Rogers again. After telling Conrad to stop, Rogers pulled his gun and fired. He shot pretty quick. Three or four shots were fired. After the shooting, Conrad turned around and said. "I will get you yet." While Rogers was shooting, Conrad was moving his horse up toward Rogers. When Conrad started to go off, Rogers quit shooting. After the shooting was over, Rogers did not say, "I hope I have killed the son of a bitch."

Jeff Ingalls testified for defendant: That he was acquainted with the deceased and defendant, that he was acquainted with the general reputation of the deceased as to being a quiet and peaceable citizen, and that his reputation was bad. Witness heard deceased say it was all he could do to keep from cracking the defendant's head, "and he asked me what I would have done if he had done that there in the bank, and I told him I would do

just the same as he would do, if I should go into his home and find him talking to a neighbor." That deceased was in a very bad humor. Deceased also said, "I can kill the son of a bitch, and never step my foot in a jail." Deceased left the bank, asserting that he would get Rogers yet.

Walter Russell testified for the defendant: That on the evening after the shooting the state's witness Butler came to the bank at Hardy. He said he did not know just how the difficulty came up. That Conrad struck the defendant with his fist, or a piece of rope, or something; he couldn't tell what it was.

Appellant introduced the testimony of a number of other threats made by deceased against him, some of which were communicated, and some were not. Appellant also proved by a number of witnesses that the reputation of appellant as a quiet, peaceable, law-abiding citizen in the community in which he lived was good, and also introduced a number of witnesses, who testified that the reputation of the deceased in the community in which he resided as a quiet, peaceable, law-abiding citizen was bad. The state offered considerable rebutting testimony.

The foregoing condensed statement is all that is necessary to show the facts and circumstances necessary to a determination of the legal questions involved.

*Sam K. Sullivan* and *Hackney & Lafferty,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen., and *C. L. Pinkham,* Special Counsel, for the State.

FURMAN, P. J. (after stating the facts as above). First, Upon the trial of this cause, when appellant was upon the stand as a witness in his own behalf, the record shows that the following occurred:

"Q. Now, Mr. Rogers, before this time, and after you had the other difficulty with Conrad, had you heard of any threats which had been made by Conrad against you?

"Judge Pinkham: Objected to as incompetent, irrelevant, and immaterial; no foundation having been laid for the introduction of threats.

"The Court: Overruled.

"A. I did. Q. Where and from whom did you learn of those threats? A. Mr. Boone. Q. What Boone is that? A. The cashier of the bank at Hardy. Q. How long before the 28th of February did you learn of that? A. I judge something like a week before, or three or four days. Q. What were they, what were the statements that were made, told to you by Boone, that Conrad had said?

"Judge Pinkham: Objected to as hearsay, incompetent, irrelevant, and immaterial.

"The Court: Objection sustained.

"Judge Lafferty: Exception.

"Judge Lafferty: We can prove—that would show the condition of his mind, if this party had communicated the threats to him.

"The Court: You can show the threats, and then that it was communicated to him.

"Judge Pinkham: That would be a self-serving statement. It couldn't be admitted under any statement.

"The Court: You haven't proven any threat yet.

"Judge Lafferty: They objected, on the ground that we couldn't prove the threat.

"The Court: You must first prove the threat, and then that it was communicated to him."

As we understand the ruling of the trial court, it was that, while the defendant might prove that threats made by the deceased to do him injury had been communicated to him, yet testimony as to what the threats were would not be admissible, unless the defendant first proved that as a matter of fact the threats had actually been made by the deceased. The ruling of the court requiring proof that the threats had actually been made would have been correct, if it referred only to uncommunicated threats; for they are admissible alone for the purpose of showing the mental attitude of the deceased toward the defendant, and that deceased was probably the aggressor in the fatal difficulty. While communicated threats may be considered for this purpose, yet they have another effect, because they shed light upon the mental attitude of the defendant toward the deceased at the time the homicide occurred. Communicated threats are admissible for the purpose of showing, not only the defendant's state of mind toward the deceased at the time of the homicide, but also to show the fact and the reasonableness of the defendant's apprehension

of violence at the hands of the deceased at the time of the commission of the homicide. For this purpose they are in no sense of the word hearsay, but are original evidence; and it is not necessary that the defendant should prove that such threats were actually made by the deceased before introducing them in evidence in his behalf. We have repeatedly passed upon this question contrary to the ruling of the trial court. We know the able judge who tried this case too well to believe for one moment that he intended to disregard the decisions of this court, because all persons know that under the Constitution and laws of this state the final determination of all questions involved in the trial of criminal cases must be made by this court. Otherwise, it would be folly to have an appellate court at all, and it would be impossible to have uniformity in the trial of criminal cases in this state. We are satisfied the judge at the time of this trial overlooked the previous decisions of this court on this question. As this is a matter of importance, we will repeat here what we said in the case of *Morris v. Territory*, 1 Okla. Cr. 624, 99 Pac. 762:

"The philosophy of the law of communicated threats in cases of homicide, when self-defense is relied upon, is that such threats may be considered by the jury for two purposes:

"(1) As showing the state of mind of the defendant and the reasonableness of his apprehension or fear of imminent peril of receiving serious bodily injury or of losing his life at the hands of the deceased at the time of the homicide, based upon some act then done by the deceased, which, viewed in the light of such communicated threats, · indicated a purpose on the part of deceased to then carry such threats into execution. In order to make communicated threats admissible for this purpose, it is not necessary to prove that they were in fact made by the deceased. It is sufficient to prove that they were communicated to the defendant, as having been made by the deceased under such circumstances and coming from· such a source as would authorize a reasonable man, situated as the defendant then was, to honestly believe that such information was true. After an able and exhaustive discussion of this question by the Court of Criminal Appeals of Texas, in the case of *Logan v. State*, 17 Tex. App. 50, that court held that in cases of communicated threats it was not necessary to prove that such threats were actually made. The real questions are: Were they communicated to the defendant? and Were they of such a character, in connection with the acts

of the deceased at the time of the homicide, as to create a reasonable apprehension or fear of death or serious bodily harm, in the mind of the defendant, at the hands of the deceased, at the time that the defendant fired the fatal shot? In Logan's Case the trial court refused to allow the defendant to prove that such threats had been communicated to him, just before the fatal difficulty, by one John Tosh. After the homicide, and before the trial, Tosh had died. A number of witnesses heard Tosh communicate the threats to Logan. The trial court held that such communicated threats were hearsay, unless the defendant first proved that they were actually made by the deceased. Upon a review of the entire matter, and a full discussion of the authorities, the court held that the fact that such threats were communicated to the defendant was original evidence, and that its exclusion was error.

"The force of the logic of this position is unanswerable, for two reasons: First. An honest mistake of fact, based upon reasonable grounds, does not make a man a felon. Second. A defendant is always justifiable in acting in his self-defense, or in the defense of his family or property, according to the circumstances as they reasonably appear to him at the time; and if he acts in good faith, and upon reasonable appearances of danger, the law will hold him guiltless, although it may afterwards turn out that he was mistaken, and there was in fact no danger. As to this issue, the question is not, Were the threats actually made? but it is, Did the defendant have reasonable ground to believe, and did he in good faith believe, that the threats had been made, and that deceased then did some act indicating a purpose to carry such threats into execution? The first ground upon which communicated threats are admissible deals alone with the purpose, the intention, the state of mind, and the apprehensions of the defendant. It has nothing at all to do with the state of mind of the deceased. But suppose that a third person is present at the time of the homicide, and by some word or act then spoken or done gives the defendant reasonable ground to believe that he is acting with the deceased in pursuance of a common design to inflict serious injury upon or to kill the defendant; then the defendant may introduce evidence of threats communicated to him, purporting to have been made by such persons, and the admissibility of such communicated threats will rest upon the same ground and be governed by the same principles as are the communicated threats purporting to have been made by the deceased. In the case of *Price v. Territory*, 1 Okla. Cr. 358, 98 Pac. 447, this court held: 'When there is the least degree of acting together

between two or more parties in the perpetration of an unlawful act, the threats or declarations of one in furtherance of the common design are admissible against all of his associates, although made in the absence of others.' But evidence of threats made against the defendant by a person who was not present at the homicide, and is not shown to have been acting with the deceased, is not admissible. 21 Cyc. p. 896, and authorities there cited. This is the basis, the extent, and the limit of the rule admitting threats made against the defendant by any other person than the deceased, in cases where threats are admissible.

"The second purpose for which communicated threats may be considered by the jury is to aid them in determining as to who was probably the aggressor in the fatal difficulty. This involves the state of mind and the intentions of the deceased, as well as the defendant, and like uncommunicated threats, before they can be considered for this purpose it must be proved that they were actually made by the deceased, or by some one acting with him, under the conditions hereinbefore stated. To make this clear: If it is proven that threats purporting to have been made by the deceased, or some one acting with him, to kill or inflict serious bodly injury upon the defendant, were simply communicated to the defendant, then they are admissible, and can only be considered by the jury for the purpose of determining the reasonableness of the defendant's apprehensions of receiving death or great bodily harm at the hands of the deceased or the person so acting with him, as hereinbefore stated; while, upon the other hand, it must be proven that such threats were actually made by the deceased, or such other person acting with him, against the defendant, before they can be considered by the jury for the purpose of assisting them to ascertain the state of mind of all of the parties engaged in the fatal difficulty and determining who probably began the difficulty. From these premises, it necessarily follows that, before any questions can be asked as to threats made by third parties, there must be at least some evidence that such third person was present at the time of the homicide and was acting with the deceased in the commission of an unlawful act against the defendant."

The case of *Morris v. Territory, supra,* was reaffirmed in the case of *Lowry White v. State,* 4 Okla. Cr., beginning on page 159, 111 Pac. 1017. This court there said:

"The defendant complains that he was not permitted to testify as to threats which had been communicated to him as having been made by the deceased. The record upon this question is as follows: 'Q. Now, Mr. White, just tell the jury what

threats, if any, were communicated to you by any one, and by whom; threats that were said to have been made by Mr. Haustein; what he would do with you. By Mr. McKeever: The state objects to that question, for the reason that it is immaterial, and for the further reason that no foundation has been laid for it; and it is objected to for the further reason that it is heresay. It could not be anything but hearsay, and it is not connected with the deceased in any way, except by hearsay evidence. By Mr. Hubbell: It may be proved in that way. It may be proved by the accused himself that the threats were communicated to him. It can then be proved by the person who communicated the threats, or the person who communicated the threats may not have heard the threats—even the person who communicated the threats may have heard from some one else that the deceased made the threats, or it may be that the threats were made by the deceased to the party who communicated them, and it is just as competent for certain purposes to show that they were made directly by the deceased to the accused, and it is to show the animus of the deceased, how his state of mind was toward defendant, and aid us in explaining about the difficulty on that particular date down there. By Mr. McKeever (county attorney): If the court please, if the threats were communicated to this defendant, this defendant can't testify to that. It might be in the matter of corroborating another witness, but it could not be in any more than a self-serving declaration of this defendant to make a statement of that kind. It would be hearsay evidence. The threats might have been communicated to Lowry White, and yet never made by Haustein. By the Court: I think I will sustain the objection to that at this time, Mr. Hubbell. By Mr. Hubbell: To which ruling of the court, sustaining the objection, the defendants, and each of them, except.' We cannot agree with the trial court as to the ground upon which this evidence of communicated threats was excluded. When threats are admissible in evidence, it is competent for the defendant, or any other person who may have heard such threats communicated to the defendant, to testify to that fact, and such evidence is not in any sense of the word hearsay. The fact that they were so communicated would be original evidence; for the issue would be as to the communication of the threats, and not as to whether they were actually made. A defendant is always justifiable when he acts upon the facts as they reasonably appear to him at the time when those appearances, if true, would be sufficient in law to constitute a defense, and it is immaterial as to whether his information is true or false, provided he acts in good faith and upon reasonable information and

appearances of danger. For a full discussion of this question, see *Morris v. Territory*, 1 Okla. Cr. 617 [99 Pac. 760, 101 Pac. 111]."

This court has several times reaffirmed the doctrine here announced. We earnestly recommend that trial courts keep themselves informed as to what this court has decided, for when they overlook or disregard the decisions of this court they are simply inviting a reversal of their judgments, for we cannot evade the responsibility placed upon us by the Constitution and laws of this state.

Second. The record shows that soon after the fatal difficulty the deceased was carried to the hospital at Arkansas City where he died. Arkansas City is only a few miles from the place of the difficulty. Upon the trial of this cause the appellant offered to prove, by an undertaker in Arkansas City and a nurse at the hospital in Arkansas City at which deceased was carried shortly after he was wounded, that brass knucks and four knives were taken from the pocket of the coat that deceased had on when brought to the hospital after being wounded, and also offered to prove that this coat was the same coat worn by the deceased at the time of the shooting. All of which, upon motion of the state, was excluded by the trial court. The record shows that, from the time of the shooting until his coat was taken off after reaching Arkansas City, the deceased was in the hands of his friends, and there is no intimation that any persons friendly to appellant had opportunity to place the brass knucks and the knives in the coat pocket of deceased.

In the exclusion of this testimony there was error. Upon the trial of this cause P. Schoonover testified, in behalf of appellant, that shortly prior to the fatal difficulty he heard the deceased, speaking of appellant, say that he was going to "break his God damn neck like a rabbit," and at the same time deceased rammed his hand down in his pocket, and drew it out, and struck a barn door with knucks, and said, "This is the way I will fix the God damn son of a bitch." In view of this and other testimony in the record, we think it was material for the jury to know that deceased was armed with brass knucks at the time of the fatal

shooting. When the parties met, the deceased, apparently intending to pass appellant, rode up until he was opposite him, and then, without the least provocation or word of warning, the deceased struck appellant a blow on the neck which was so serious that appellant was knocked over onto one of the horses hitched to the wagon. The assault was so sudden as to be altogether unanticipated, and no one could say what deceased struck appellant with. One of the witnesses did say he struck him with his fist, a piece of rope, or something. This evidence that deceased was armed with brass knucks at the time of the fatal difficulty, in connection with his previous threats as to how he was going to use them, and the manner in which he would break the neck of appellant, and the manner in which the blow was struck, all rendered this evidence competent and material, and it was error for the court to exclude it.

Third. This case appears to have been tried upon the theory that appellant should be convicted at all hazards and that he had no rights which any one was bound to respect. The record contains side-bar remarks and insinuations which we think were unjust, both to appellant and his counsel, and are not warranted by the record. We will offer one of these as an illustration of the manner in which appellant was tried. When the prosecuting attorney was endeavoring to secure the admission of a map of the place where the fatal difficulty occurred, the record shows that the following took place:

"Mr. Sullivan: Wait a minute. We object to the use of this map until it is proven to be a correct map.

"Mr. Pinkham: They may have got rid of the surveyor, I understand that; but we are trying to prove it.

"Mr. Sullivan: We object to that remark of counsel.

"The Court: It is not necessary to prove it by a surveyor; let the witness examine it, and state what it is."

It was the right and duty of counsel for appellant to object to the introduction of the map until it was proven to be correct. The side-bar remarks made by the prosecuting attorney were altogether uncalled for and contained highly improper inferences. They were calculated to create the impression upon the minds of the jury that appellant and his counsel, or both, were trying to

suppress testimony, and that to accomplish this purpose they had gotten rid of the surveyor, the man necessary to prove the accuracy of the map, and had thereby placed counsel for the state at a great disadvantage in proving the map. The effect of such remarks, if allowed to go unchallenged, could not but be injurious. The jury would think that they were true unless they were re-sented by counsel for the defendant, and that they were proper, unless rebuked by the court. If prosecuting attorneys are permitted to make such remarks as these, and counsel for the defense are not protected by the court, it will in many cases lead to personal difficulties in court, to the great scandal of the administration of justice. Just such remarks as these, within the personal experience and knowledge of the writer of this opinion, have resulted in courthouse fights in which blood has been shed, and in one instance a life was lost. We truly hope that nothing of this sort will ever happen in Oklahoma courts; but it can only be prevented by prompt action on the part of the trial courts in suppressing all such side-bar remarks.

Aside from this, it is unfair to a defendant to be tried upon this basis. It is one thing to furnish hard arguments; it is entirely another and different thing to call hard names and make unfair insinuations. They should never be tolerated in courts of justice. We are not unmindful of the fact that in a trial the zeal of counsel often causes them to overstep the bounds of propriety without intending to do so. But a timely admonition from the court will generally be sufficient to keep them within due bounds. It is the fixed purpose of this court to rigidly enforce the doctrine of harmless error, and when a defendant has been fairly tried, and proven to be guilty, we will not reverse a conviction for any harmless error committed by the trial court or prosecuting attorney. But this doctrine is based upon the hypothesis that the defendant should have a fair trial. This is his constitutional right, and we are determined not to tolerate any other kind of practice in Oklahoma. If counsel for defendant must treat the court and prosecuting attorney with fairness, they should receive the same treatment in return; otherwise, the doctrine of harmless error would be false upon its very face, and would be-

come an intolerable nuisance and a rank injustice. That which is injurious can never be harmless, and that which is unfair is nearly always injurious.

As was said by this court in the case of *Hicks v. U. S.*, 2 Okla. Cr. 628, 103 Pac. 874:

"Unfairness, whether intentional or not, taints everything it touches, and will vitiate a verdict, unless it clearly appears from the record that there was no rational conclusion at which the jury could have arrived favorable to the defendant, and it must be absolutely clear upon this question, to wipe this taint out."

Whenever in the trial of a case counsel on either side ask questions which they know to be improper, and which contain unfair and injurious inferences, or whenever counsel indulge in unfair side-bar remarks, the trial court should not wait for an objection, but should interfere promptly, and sternly rebuke such conduct and admonish counsel to desist therefrom, it matters not who the lawyer may be; the more prominent and influential the lawyer guilty of such conduct may be, the greater the necessity for the action of the court. Upon a second offense, the offending party should be punished for contempt of court. If the trial courts of Oklahoma will fearlessly perform their duty in this respect, we will have no courthouse fights, and unfair practice will be greatly diminished. This will redound greatly to the reputation of the courts, and also to the proper administration of justice. We trust that we will not have to comment on this matter again; but it might as well be understood, now as later, that this court has no pets or favorites, and is determined to do all in its power to raise professional ethics to the highest possible standard in Oklahoma, and that we will not tolerate unfair methods in the trial of criminal cases in courts of record of this state, whether practiced by counsel for the state or the defense.

Fourth. When the state's witness Butler was upon the witness stand, after testifying that he was in company with the deceased on the morning of the difficulty before the fatal shooting, and as to where they came from, and where they were going, and what their business was, and all that occurred while they were to-

gether, on cross-examination he was asked the following question:

"Q. Did you take a drink of liquor anywhere on the road that morning?

"Mr. Pinkham: Objected to as incompetent, irrelevant, and immaterial.

"The Court: Sustained.

"Mr. Sullivan: We except.

"Q. Did he (meaning deceased) have any liquor in his pocket?

"Mr. Pinkham: Objected to as incompetent, irrelevant, and immaterial.

"The Court: It is not cross-examination. Objection sustained."

To which counsel for appellant excepted.

The record further shows the following questions and answers:

"Q. Now, in riding down from where you met Mr. Conrad to where you met Mr. Rogers and the other parties, did Mr. Conrad take a drink of liquor?

"Mr. Pinkham: Objected to as incompetent, irrelevant, and immaterial, and not proper cross-examination, and does not prove any issue in this case.

"The Court: No; it is not cross-examination.

"Mr. Sullivan: We have a right to know all that those parties did.

"The Court: Yes; you have a right to put him on the witness stand in your defense.

"Mr. Sullivan: This is cross-examination. He is telling what happened from the time he got onto that horse until he got into Hardy.

"The Court: That would be immaterial anyhow.

"Mr. Pinkham: I think it would be immaterial. We object to it as incompetent, irrelevant, and immaterial, and not proper cross-examination.

"Mr. Sullivan: We don't want to make a hostile witness our witness to prove this.

"Mr. Pinkham: It is nothing, if your honor please, if it is proved; it is immaterial in this case; it is no ground of defense, and proves no issue.

"The Court: No; I will sustain the objection. I don't think it is material.

"Mr. Sullivan: To which we except. That is all.

"The Court: I will permit you to show the condition of Conrad.

"Mr. Sullivan: I don't know how we could show the condition any other way, only to show that he had been drinking.

"By Mr. Sullivan: Q. I will ask you, had he been drinking coming down over the hill?

"Mr. Pinkham: Objected to as incompetent, irrelevant, and immaterial.

"The Court: Sustained.

"Mr. Sullivan: We except.

"Q. Do you know whether he was in an intoxicated condition or not?

"Mr. Pinkham: Objected to, for the same reason.

"The Court: Overruled.

"A. No; I don't. Q. You don't know whether he was or not? A. No, sir. Q. But you know he had been drinking, don't you?

"Mr. Pinkham: Objected to as incompetent, irrelevant, and immaterial.

"The Court: Objection sustained.

"Judge Sullivan: Exception.

"Judge Hackney: Note our exceptions.

"The Court: The stenographer notes all exceptions—gives you an exception to any objections.

"Mr. Sullivan: That is all."

We think there was error in the ruling of the trial court. That Butler's evidence was material there can be no doubt. The state had placed him upon the stand as a witness, and thereby vouched for his intelligence and truthfulness and the reliability of his testimony. If it be true that he had been drinking whisky that morning, just before the occurrence with reference to which he testified, appellant had the right to ask him about it on cross-examination, for the purpose of affecting the credibility of his testimony. See *Henry v. State,* 6 Okla. Cr. 430, 119 Pac. 278. This proposition is too plain to require argument in its support. It is a fundamental principle of justice, the statement of which amounts to its demonstration. If this were not true, a witness could never be asked any question for the purpose of affecting his credibility. The testimony in this case all tended to show that, when deceased was drinking, his evil tendency was thereby augmented. The witness Butler was placed upon the stand by the

state for the purpose of testifying to what occurred at and before the fatal difficulty. The condition of the deceased during the entire time covered by Butler's testimony was a part of the *res gestae* of the transaction, and, the state having examined Butler fully with reference to all that it desired to prove had occurred during that time, it was the right of appellant, on cross-examination, to bring out anything the state had omitted to prove, which would in any manner tend to shed light upon the transaction. If Conrad's mind and passions were inflamed with drink, appellant should have been permitted to inquire fully into it. *Stouse v. State,* 6 Okla. Cr. 415, 119 Pac. 271; *Williams v. State,* 4 Okla. Cr. 523, 114 Pac. 1114. This was a proper subject of cross-examination of the witness Butler. The state cannot be permitted to prove one part of a transaction by a witness, and, by failing to question him with reference to matters which constitute a part of the *res gestae* of the same transaction, force a defendant to place a hostile witness upon the stand for the purpose of proving the matters which had been omitted by the state. If the state voluntarily opens a door, it cannot arbitrarily close it on cross-examination until the defendant has brought out all of the testimony material to a thorough understanding of that part which the state has proven.

There is no more philosophical and safer authority on the subject of evidence than Mr. Wigmore. He says:

"The Theory of Cross-Examination. (1) Proof by direct examination of the same witness, contrasted. The fundamental feature is that a witness, on his direct examination, discloses but a part of the necessary facts. That which remains suppressed or undeveloped may be of two sorts: (a) The remaining and qualifying circumstances of the subject of testimony, as known to the witness; and (b) the facts which diminish and impeach the personal trustworthiness of the witness. (a) The *remaining and qualifying circumstances of the subject of testimony* will probably remain suppressed or undisclosed, not merely because the witness frequently is a partisan, but also and chiefly because his testimony is commonly given only by way of answers to specific interrogatories (*ante,* sections 768, 785), and the counsel producing him will usually ask for nothing but the facts favorable to his party. If nothing more were done to unveil all the facts known to this witness, his testimony (for all that we could sur-

mise) might present half-truths only. Some one must probe for the possible and (usual) remainder. The best person to do this is the one most vitally interested, namely, the opponent. Cross- examination, then—i. e., further examination by the opponent— has for its first utility the extraction of the remaining qualifying circumstances, if any, known to the witness, but hitherto undis- closed by him. (b) The *facts which diminish and impeach* the personal *trustworthiness or credit of the witness* will also, in every likelihood, have remained undisclosed on the direct examin- ation. These it is the further function of the opponent's examin- ation to extract. Some of them, no doubt, could be as well or sometimes better proved by other witnesses. But many of them can be obtained only from the witness himself—particularly those which concern his personal conduct and his sources of knowledge for the case in hand. To this extent, again, cross-examination is vital; i. e., it does what must be done and what nothing else can do." (See volume 2, sec. 1368, Wigmore on Evidence.)

The English and Canadian courts and many of the courts of the American states go much further than this, holding that, when a witness is placed on the stand to prove one fact, he may be cross-examined by the opposite side as to the entire case. Many good reasons are given for this rule, and the weight of modern authority seems to support it. But the proper determination of the question now before us does not require that we should con- sider the extent to which cross-examination may be carried. We feel absolutely sure of the ground upon which this opinion rests, and will postpone a further consideration of the subject to the necessities of some future case, although we are inclined to take a liberal view of the rights of a party in cross-examining a hostile witness. Otherwise, it would often be impossible to develop the entire truth of a controversy.

Fifth. When appellant was upon the witness stand, the rec- ord shows that the following occurred:

"Q. Had you, at any time prior to February of this year, had any difficulty with him? A. I had. Q. When was that? A. Why, some time in the latter part of December, I think. Q. Where was it? A. West of Hardy. Q. How did that happen?

"Judge Pinkham: Objected to as incompetent, irrelevant, and immaterial.

"The Court: Yes; objection sustained. He can state he had a difficulty.

"Q.  Did he at that time make any assault on you?

"Judge Pinkham:  We object to that as incompetent, irrelevant, and immaterial, and calling for a conclusion.

"The Court:  Yes; objection sustained.

"Judge Lafferty:  Well, we except.

"Q.  What, if anything, did he do towards you at that time?

"Judge Pinkham:  We object to that as incompetent, irrelevant, and immaterial.

"Judge Lafferty:  I think we are entitled to show something that occurred there at that time.

"The Court:  Oh, I will permit him to state that they had trouble; there is no use to go into the details of it.

"Judge Pinkham:  You can't try that controversy.

"Judge Lafferty:  We are not going to try it.

"Judge Lafferty:  Save us an exception.

"Q.  Now, after that time, did you have any further controversy with him, or other controversy?  A. Yes, sir.  Q. Who was the aggressor in that difficulty that you had at that time?

"Judge Pinkham:  Objected to as incompetent, irrelevant, and immaterial.

"The Court:  Objection sustained."

It is made to appear that, if the witness had been permitted to answer the above questions, he would have testified that at the time in question he met the deceased on the public road, appellant being on horseback and deceased being in a buggy with old man Fields, and when they met, deceased jumped out of the buggy and rushed at appellant.  Appellant turned his horse and started to run.  The deceased grabbed the tail of appellant's overcoat and hung onto it; that appellant spurred his horse into a run, and that deceased held onto appellant's coat so strongly that the tail of his coat was torn off from the body, and when appellant finally escaped from deceased he left the tail of his coat in possession of deceased.

In the exclusion of this testimony we think there was error. Why are previous threats made by the deceased to do violence toward the defendant admissible in evidence?  They are admissible for two purposes only:  First, because they manifest a disposition upon the part of the deceased to do violence to the defendant, and thereby tend to prove that the deceased was probably the aggressor in the fatal combat; second, because, when

accompanied by some overt act, they assist in proving grounds of reasonable apprehension of danger on the part of the defendant of injury from the deceased. It is a familiar maxim that actions speak louder than words, and it is a rule of everyday life that we judge men by their actions rather than by their words. If a threat to do injury is admissible for the purposes above stated, we must confess that we are utterly unable to understand the reason and justice of rejecting evidence of a deliberate attempt to do injury. We think that proof of previous assaults and attempts to injure have far greater probative force than any threats could have in cases of this sort. To permit appellant to testify that he had had a difficulty with the deceased, and not permit him to go further and prove who was the aggressor in this difficulty, would be mere child's play. In fact, it would injure rather than benefit appellant. We think that in a case of this sort previous assaults made by the deceased upon a defendant are admissible for the same purposes that threats are admissible.

This question came before the Supreme Court of the territory of Oklahoma in the case of *McHugh v. Territory*, 17 Okla. 20, 86 Pac. 439, and we heartily indorse the views there expressed. That court said:

"Now, we think the universal holding of the courts is that communicated threats are always admissible, as tending to show the reasonableness of the fear entertained by a person who claims to have acted in self-defense, and the only class of threats which are excluded by any court for this purpose are uncommunicated threats. Now, if mere threats are competent, when communicated, it would seem to us that a stronger reason exists for admitting overt acts of hostility, which amount to an assault with a deadly weapon. An assault, if committed, would require no further agency to apprise the defendant of the malicious intention of the prosecuting witness. The acts are committed upon him, and would be still stronger in their nature than any communicated threats could be; and it seems to us they were clearly competent to show the reasonableness of the fear which the defendant says he entertained at the time he fired the shot, as it would tend to show the feelings existing between the prosecuting witness and the defendant, and it would have the purpose of corroborating, by inference at least, the testimony of the defendant when he says that he acted in self-defense.

"In the case of *State of Kansas v. Charles E. Scott,* 24 Kan. 68, the court says: 'This was a criminal prosecution for assault with intent to kill. The state of Kansas was plaintiff, Charles R. Scott was defendant, and Herman Richner was the person alleged to have been shot. The defendant was convicted and sentenced, and he now appeals to this court. That the defendant shot Richner with a gun loaded with shot there can be no doubt; but still the defendant claims that the transaction did not, under the circumstances, amount to a felonious assault. Indeed, he claims, among other things, that he did the shooting in defense of his own person; and whether the shooting was in self-defense or not was one of the principal questions in the case. Defendant's wife was placed on the stand, and asked this question: "Prior to this day (meaning the day of the shooting), state when, if ever, you saw any attack made by Herman Richner, in your own house, with a deadly weapon, upon your husband, and what threats Richner then made." The defendant here offered to prove by the witness that, some months prior to the alleged offense, Herman Richner, at the house of the defendant, did make an assault upon the defendant, by means of a heavy iron rasp, a deadly weapon, did wound the said defendant over the head, threatening to kill him, and would have done so unless prevented, to which offer the plaintiff objected that it is irrelevant, which the court sustained, and to which the defendant then and there excepted and still excepts. Thereupon, the defendant asked the witness, "State whether or not you know the character of Herman Richner for turbulence and violence, and the state of his feelings toward the defendant." The defendant here offered to prove that the prosecuting witness, Herman Richner, was a turbulent, violent, quarrelsome, and dangerous person, who was in the habit of carrying deadly weapons, and was at enmity of long standing with the defendant, had had numerous encounters with the defendant, and had made frequent threats, which had been communicated to him. To this the plaintiff objected as irrelevant, and the court sustained the objection, to which ruling the defendant then and there excepted, and still excepts. It was the defendant who fired the gun which was heard by the defendant's wife, and it is that shooting for which the defendant is now prosecuted, and which he is now charged with having committed an assault with intent to kill. We think the court below erred in excluding the said evidence of the defendant's wife. Said evidence (along with the other evidence in the case, and being corroborative of much of such other evidence) was competent, not only as tending to show that Richner was in fact about to com-

mit a felony upon the person of the defendant, but also as tending
to show that the defendant believed that Richner was about to
commit such felony.    If all the facts which the defendant's evi-
dence tended to prove were true, the defendant undoubtedly had
a right to defend himself with a gun, even to the taking of the
life of Richner.    In many cases it is not competent for a defend-
ant in a criminal prosecution to show prior transactions, of prior
troubles; but in this case we think it was.    In this case we think
it was competent for the defendant to show the prior assaults and
prior threats made by Richner, with regard to himself; for such
evidence not only tended to show the nature and character of
Richner's acts at the time the alleged assault was committed, but
it also tended to show the nature and character of the defend-
ant's opinions, beliefs, and intentions.    We think that the said
excluded evidence should have been submitted to the jury. * * *
The judgment of the court below will be reversed, and cause re-
manded to the court below for a new trial.'

"Now, we think this case is almost a parallel case with the
case at bar.    It is true that in the Kansas case there was not
only an assault, but there were threats accompanying the assault;
but we do not think this changes the rule.    The Supreme Court
of Kansas there holds in unmistakable terms to the doctrine that
this previous assault was admissible for the purpose of showing
the reasonableness of the fear which the defendant claims he
entertained at the time of the assault, as well as to show the na-
ture and character of the prosecuting witness, and his feelings
towards the defendant."

The question now before us has been practically decided by
this court in the case of *Mulkey v. State,* 5 Okla. Cr., beginning on
page 96, 113 Pac. 540.    Judge Doyle there said:

"The seventh to the thirteenth, inclusive, assignments of
error refer to the action of the trial court in refusing the defend-
ant permission to prove specific acts of violence and misconduct
on the part of the deceased, for the purpose of showing his ac-
tual lawless disposition, and as evidencing the deceased's prob-
able aggression.    We deem it unnecessary to burden this opinion
with each specific offer of proof, and will only refer to one.    The
defendant offered to prove by the witness L. Larson that, a short
time prior to the death of Dennis Lawson, the witness asked him
for an account he owed, whereupon the deceased became furious,
drew his knife upon witness, and, if witness had not thrown his
pistol in deceased's face, deceased would have killed him; that,
subsequent to this event, the deceased came to the witness, and,

while talking to him in a friendly way about the account, suddenly attempted to draw a pistol, but was prevented by the witnesses Stallcup and Fatheree. The court seems to have excluded this testimony, on the theory that it was an attempt to prove the character of deceased by these specific acts. As a general rule, the evidence of the character of the deceased must be confined to his general reputation, and evidence of particular acts of violence is inadmissible, unless they were directly connected with that involved in the homicide. Usually testimony of this character would have but little bearing upon the case, and the general reputation of the deceased as being a desperate and dangerous man would be sufficient. But, under the facts which the evidence here tends to prove, these prior assaults and acts of violence, being known to the defendant, were important circumstances in determining from the standpoint of the defendant the reasonableness of the danger apprehended by him, and for this reason it was error to exclude this testimony.

"Prof. Wigmore says: 'When the issue of self-defense is made in a trial for homicide, and thus a controversy arises whether the deceased was the aggressor, one's persuasion will be more or less affected by the character of the deceased. It may throw much light on the probabilities of the deceased's action.' 1 Wigmore on Evidence, sec. 63. 'When the turbulent character of the deceased, in a prosecution for homicide, is relevant, there is no substantial reason against evidencing the character of particular instances of violence or quarrelsome conduct. Such instances may be very significant. Their number can be controlled by the trial court's discretion; and the prohibitory considerations applicable to an accused's character have here little or no force.' 1 Wigmore on Evidence, sec. 198.

"In the case of *Sneed v. Territory of Oklahoma,* 16 Okla. 641, 86 Pac. 70, 8 Ann. Cas. 354, Justice Pancoast, delivering the opinion of the court, said: 'The general rule is well settled by a long line of decisions that neither in criminal nor civil cases can the character or reputation of a person be proven by specific acts; but this is only the general rule, and, if the offer of evidence under consideration here can be classed as an attempt to prove character or reputation by specific acts, then it falls within an exception to the general rule; but we think that, while the evidence sought to be introduced may tend to show the character of the deceased, yet the purpose of its introduction and the reason for its admissibility was that it showed knowledge in the defendant of the violent temper of the deceased, and his disposition to use his gun on small provocation; also his condition of mind when affected by the use of liquor, or when in a condition of in-

toxication, and this violent temper, condition of mind, and disposition to use a gun upon small provocation was information to the defendant, brought home to him by reason of his personal observation of the deceased and his acts.   The knowledge of the defendant, derived from such personal observation, as well as otherwise, of the violent temper of the deceased, and his liability to attack persons without cause, is a most important circumstance in determining from the standpoint of the accused the reasonableness of the danger apprehended by him, and from which the defendant might estimate the conduct of the deceased, the character of the attack made upon him, and what one might expect from his assailant, as well as that which he might at the moment deem necessary to guard himself against.   Certainly the knowledge derived from this source of the acts of the deceased, showing his disposition for violence and a depraved condition of mind, would be as likely, or more likely, to affect the mind of the defendant than general information he might have obtained in common with the community that the deceased was a man of high temper and violent disposition when in a state of intoxication.   *People v. Harris,* 95 Mich. 87, 54 N. W. 648; *Hurd v. People,* 25 Mich. 405-418; *People v. Lilly,* 38 Mich. 270; *State v. Testerman,* 68 Mo. 408.   This testimony which was excluded was peculiarly important in this case,· because of the fact that there was no eyewitness to the affray other than the defendant, and because the evidence showed that the defendant and the deceased were on friendly terms, were up to the very moment of the difficulty friends, and at the moment of the difficulty, without any provocation, either one or the other committed an uncalled-for violent attack upon the other, which attack was of a character and under conditions not susceptible of explanation, except upon the hypothesis that it was unprovoked.   This being true, it was of the utmost importance that the jury should be allowed to hear evidence from which they could determine who provoked the attack, and the testimony excluded would certainly tend to throw some light upon the proposition, and its exclusion was reversible error.'   See, also, *Poer v. State* (Tex. Cr. App.) 67 S. W. 500; *State v. Burton,* 63 Kan. 602, 66 Pac. 635; *Boyle v. State,* 97 Ind. 322; *Bowlus v. State,* 130 Ind. 227, 28 N. E. 1115; *State v. Beird,* 118 Iowa, 474, 92 N. W. 694."

So far as our investigations have gone, there is an absolute unanimity among the authorities as to the admissibility of this class of testimony, where the reasonable apprehensions of the defendant of injury from the deceased is in issue.   It would,

therefore, seem to be a waste of time to further pursue the discussion of this question; but, in order to definitely settle it in Oklahoma, we will quote from an opinion by Judge Hurt, who in many respects was the greatest criminal jurist America has ever produced. Admit his premises and it is impossible to escape his conclusions. In *Russell v. State,* 11 Tex. App. 291, Judge Hurt said, and we think it cannot be answered:

"The plea of defendant was self-defense, under threats and former difficulties. The threats were made by deceased against the life of defendant, and were communicated, as well as made by deceased, to him prior to the homicide. Bearing upon the questions as to whether the grounds for fearing death or serious bodily harm were *reasonable,* defendant had the right to lay before the jury all circumstances which go to show the character of the threats, the intention with which they were made, and the grounds of fear on which the defendant acted. Evidence, therefore, of previous affrays, difficulties, attacks, and threats is admissible, being light by which the jurors are to view the acts and intentions of the parties at the time of the homicide. Nor must the evidence stop with proving merely that these affrays, difficulties, and attacks had occurred between the parties. The character of these affrays, etc., may be shown. The rules, we think, upon this subject, are these: (1) All that was said or done, or that which occurred at the time of the homicide, tending in the slightest degree to explain the transaction, or the conduct or motives of the parties, is admissible. What was said or done or occurred at the time is relevant to the main fact (the homicide fact). (2) All facts necessary to be known to explain or introduce a fact *in issue, or relevant,* or deemed to be relevant to the issue, or which support or negative a reference suggested by any such fact, or which are necessary to show the relevancy of other facts, or which explain, modify, or give character to the main fact or a relevant fact, are admissible.

"To present the subject in another light: The main fact was its *res gestae,* so called, which are the facts and circumstances immediately hovering around and directly connected with it—occurring at the time and place of the main fact. There are facts which do not form a part of the immediate surrounding facts, but are relevant to the main fact, or to these or some of these immediate facts. To this class belong threats, former difficulties, affrays, and attacks; also motive. This enumeration is for illustration, not for the purpose of naming all this class of facts. These facts, though not occurring at the time of the homicide,

being relevant to the main or some other relevant fact, have their *res gestae,* so called. The deceased threatened defendant. What were the facts and circumstances attending these threats? They had engaged in former difficulties. What were the circumstances which surrounded the difficulties, and which were calculated to give character thereto? And so a *fact which did not occur at the time of the threats or difficulties* may be relevant thereto, and it with its *res gestae* be drawn into and made a matter of inquiry; and so on until the light grows so dim or uncertain as to reflect such facts irrelevant. Just here is presented a very nice question indeed, which is this: A fact being relevant, but, owing to its remoteness in point of time, place, or other circumstances, its weight is not clearly appreciable; must the judge reject or admit the fact? Some authorities hold that the judge may, when thus so remote, fix a limit, though the fact is relevant, and reject the evidence. We think, however, if the fact is relevant, the safer and more satisfactory rule is for the judge to admit the evidence and leave the question of its weight to the jury; for so far as the judge deals with the question of its weight he interferes with the legal prerogative of the jury. If, however, these remote facts (though relating to the main fact or a relevant fact) have no tendency to explain or elucidate, then the judge, to prevent the intrusion of foreign issues, and to economize the time of the court, should reject them.

"But let us return to the reason of the rule which admits these remote facts—facts which do not properly constitute the *res gestae* of the main fact, but are clearly admissible to elucidate the main or a relevant fact. Why are they admissible? The answer to our mind is very evident. The issue being, 'Had the defendant reasonable grounds for fearing death or serious bodily harm?' to decide this question correctly, the exact relations of the parties to one another, their feelings toward each other, and their motives should be known to the jury. These being understood, an act, gesture, or word which was spoken or done at the homicide is viewed in the light of these relevant facts, as well as the immediate facts. These immediate facts are not only seen in the light of their surroundings, but are weighed and passed upon under the rays emanating from light drawn from facts occurring prior to, and sometimes great distances from, the time and place of the homicide. An illustration here, we think, is proper. A. and B. are in an altercation. B. throws his hand behind him to his hip pocket. A. shoots and kills him. The quarrel and acts of B. constitute all of the immediate facts attending the killing. The killing under the circumstances would be thought, by an honest

jury, a wanton and unprovoked murder; that to shoot down a fellow man because he merely put his hand behind him, or in his pocket, was simply an outrage upon humanity as well as law. But, suppose that B. had been breathing out threats against the life of A., had been the aggressor in a number of difficulties with him, in which he had shown himself a violent and dangerous man, and so on, this apparently harmless movement of the hand, viewed in the light of these facts (though not occurring at the time), assumes quite a different shape and proportion. It is not that accidental or insignificant thing as was supposed when seen in the light of the facts which immediately attended it, but may be pregnant not only with apparent but actual danger to the life of A. The admissibility of a fact is quite a different thing from its sufficiency. We are passing upon its competency, not its weight or conclusiveness; that is the work of the jury. These remote facts, to wit, the threats, difficulties, and affrays, being of so much importance, then, their character should be thoroughly understood by the jury. If they were not serious, the apprehensions of defendant would not be so well founded; but if they were grave, his fears would be found reasonable. Hence, to determine the gravity, all of the facts—the threats, the manner, the pressure, the occasion—in fact, everything done by the parties, or any other person, tending to show the character of these threats, difficulties, and affrays, should be presented to the jury."

Sixth. Upon the trial of this case the court, among other things, instructed the jury as follows:

"The court instructs the jury that, if a person is assaulted in such a manner as to produce on the mind of a reasonable person a belief that he is in actual danger of losing his life or suffering great bodily harm, he will be justified in defending himself, though the danger be not real, but only apparent, such person will not be held responsible criminally if he acts in self-defense from real and honest convictions as to the character of the danger, induced by reasonable evidence, though he may be mistaken as to the actual extent of the danger.

"If, at the time the defendant shot the deceased, he had reasonable cause to apprehend on the part of the deceased a design to do him some great personal injury, and there was reasonable cause for him to apprehend immediate danger of such design being accomplished, and to avert such apprehended danger he shot the deceased, and at the time he did so he had reasonable cause to believe and did believe it necessary for him to use the revolver in the way he did to protect himself from such apprehended danger, then, and in that case, the shooting was not feloni-

ous, but was justifiable, and you ought to acquit the defndant on the ground of necessary self-defense.

"It is not necessary to this defense that the danger should have been actual or real, or that the danger should have been impending and immediately about to fall. All that is necessary is that the defendant had reasonable cause to believe and did believe these facts.

"Upon the other hand, gentlemen of the jury, before you would be justified in acquitting the defendant on the ground of self-defense, you ought to believe the defendant's cause of apprehension was reasonable. Whether the facts constituting such reasonable cause have been established by the evidence you are to determine; and, unless the facts constituting such reasonable cause have been established by the evidence in the case, you cannot acquit the defendant in such case on the ground of self-defense, even though you may believe that the defendant really thought he was in danger.

"Defendant excepts. Allowed.

"W. M. BOWLES, Judge."

The fourth paragraph of the instruction complained of should have been omitted, and in its stead the jury should have been instructed that, in determining whether or not the defendant had reasonable cause to apprehend or fear death or serious bodily harm at the hands of the deceased at the time he fired the fatal shot, the jury should as far as possible place themselves in the position occupied by defendant at the time of the shooting, and view the facts and circumstances of the case from the standpoint of the defendant and as they reasonably appeared to him, and that if after so doing they entertained a reasonable doubt as to whether or not at the time the defendant fired the fatal shot he had reasonable ground to apprehend or fear death or serious bodily injury at the hands of the deceased, and in good faith acted upon this apprehension, they should resolve that doubt in his favor and acquit him. With this alteration and addition, the instruction complained of would have been clear, full, and correct.

We cannot approve the instruction as given. In the first place it required the jury to believe that the defendant's apprehension was reasonable and had been established before they could acquit him. This is not the law. A jury is not required to believe that a defendant is not guilty before they can acquit

him.   The law presumes that he is not guilty, and it is the duty of the jury to acquit him, although they may not believe him innocent, unless they find from the evidence beyond a reasonable-doubt that he is guilty.   A verdict of not guilty is not based upon a belief of innocence, but is required by law where there is a reasonable doubt of guilt.   In other words, a verdict of not guilty is not a verdict of innocence.   It is simply a verdict that the state has failed to establish the guilt of the defendant beyond a reasonable doubt.   This is the plain letter of our statute, and by it courts are bound, whether they like it or not.   The fourth paragraph of the instruction given is also erroneous because it shifts the burden of proof, and requires the defendant to establish his defense, without instructing the jury that it is only necessary for the evidence, whether for the state or the defendant, to raise a reasonable doubt as to the matter in issue.   The instruction given, taken as a whole, is also erroneous because it did not instruct the jury that, in passing upon the question as to whether or not the defendant acted upon reasonable appearances of danger, they must place themselves in the position occupied by the defendant and view the facts and circumstances in evidence from the defendant's standpoint and as they then reasonably appeared to him.

The most condensed and at the same time the clearest statement of the law upon this subject we have ever seen is found in the case of *Bell v. State,* 20 Tex. App. 450, made by Judge Hurt of that state, and is as follows: '

"Now, there must be, to justify, actual or apparent danger; and the existence of the one or the other must reasonably appear at the time of the homicide.   In other words, the party killing, to justify, must have reasonable apprehension or fear of death or serious bodily harm, at the time of the killing.   These principles are fully and clearly given to the jury in the charge.   But to whom must the appearances of danger—the *apprehension* of the party killing—*reasonably* appear?   To the jury, after hearing *all* the evidence—after ascertaining the *real* facts, 'a great many of which might not, could not, and doubtless were not known to defendant at the time of the killing?'   Or must the real or apparent danger appear to *defendant* at the time of the homicide to be reasonable?   We think the latter is correct.   The jury must view the facts from his standpoint.   Each juror must place himself in the position of the defendant at the time of the homicide, and de-

termine from all the facts, as they appeared to defendant at the time of the killing, whether his apprehension or fear of death or serious bodily harm was reasonable; and, if so, they should acquit. For, says Mr. Wharton, whether the danger is apparent is to be determined from the defendant's standpoint. Whar. on Hom. sec. 493; *Haney v. Comm.* (Ky. Ct. App.) 5 Cr. Law Mag. 47. See, also, *State v. Cain,* 20 W. Va. 679. The correctness of this proposition is now well settled. *Jones v. State,* 17 Tex. App. 602; *Jordon v. State,* 11 Tex. App. 435; *Blake v. State,* 3 Tex. App. 581."

The love of life and its preservation is a matter of instinct with all beings. Without this the human race would soon become extinct. The law of self-defense is therefore of necessity founded upon the law of nature, and is not and cannot be superseded by any law of society. An evil intent is a necessary element of murder and all of its kindred offenses. No matter what the act may be, if this intent is wanting, the offense will not be complete. The intent, then, is the true gist and gravamen of offenses of this character, and upon a trial for murder the real issue is not as to *how,* but is rather as to *why,* the homicide was committed. We can never safely judge as to the motives of others, unless, as some law books say, we "put on their shoes," stand in their places, hear what they hear and have heard, and see what they see. Then only can we safely determine as to whether or not they acted upon reasonable apprehensions. It is true that a jury should determine as to whether or not the defendant acted upon reasonable appearances of danger at the time of the homicide; but in determining this question each juror should as near as possible put himself in the defendant's place and view the facts and circumstances of the case from the defendant's standpoint and as they then reasonably appeared to him. This is the only logical view that can be taken of this question, and it is in strict harmony with the principles of human nature and natural justice. It is absurd to say that a jury can determine what a defendant's intention was at the time of the fatal difficulty, if they view the facts and circumstances from any standpoint other than that of his. This is not a hastily formed opinion with the members of this court, but it is the result of the reflections and investigations of a lifetime, and it may be accepted by the trial courts and the

profession as the settled policy of this court.  The law did not make men, but it was made by men and for men.  It does not judge men by an angelic standard, or require perfection at their hands.  "Put yourself in his place."  It is a safe rule to follow in life before judging another, and it is the only logical rule by which a jury can pass upon the intentions of a defendant.  When they have done this, and not before, can they safely determine as to whether a defendant acted upon reasonable appearances of danger.

Seventh.  Upon the trial of this cause, among other things, the court instructed the jury as follows:

"If you shall find that any witness has willfully testified falsely as to any material question, then you are at liberty to disregard the whole of the testimony of such witness, except in so far as the same may be corroborated by other credible evidence."

To tell the jury that they were at liberty to disregard the testimony of a witness who they believed had willfully testified falsely as to any material fact, except in so far as the same might be corroborated by other credible evidence, was to tell them that, if they found that such testimony was so corroborated, they were bound to accept and act upon it, notwithstanding the fact they might still believe it to be untrue.  Under our statute the jury are the exclusive judges of the facts proven, the credibility of the witnesses, and the weight of the testimony, and no court has the right to give a jury a mandatory instruction as to what testimony they shall or shall not believe and act upon.  Neither has the court the right to advise or suggest to a jury what weight they should give to the testimony of any witness, either in whole or in part.  There is no law compelling a jury to accept or act upon the testimony of any witness, when they may believe that such testimony is false, either in whole or in part.  This is a matter which is addressed alone to the intelligence and conscience of the jurors, and they are in every way as well qualified to pass upon it themselves as any judge could be.  This is not a question of law. It is simply a matter of belief, which must be left to every juror to act upon for himself, without any attempt at coercion from the court.  See *Gilbert v. State, ante,* 127 Pac. 889, decided at this term.  Counsel for appellant did not reserve an exception to this

instruction when it was given. Therefore we would not have considered it, had it not been for the fact that the judgment in this case must be reversed on account of the commission of errors which were excepted to, and we simply desire to say that, in the event of another trial of this cause, the instruction now under consideration should not be given.

While it is the duty of this court upon appeal to render judgment without regard to errors occurring at a trial which did not deprive the defendant of some substantial right, yet the mere fact that a man is accused of a crime and placed upon trial does not necessarily raise the presumption that he is guilty, or authorize a prosecuting attorney or trial court to fail to give him a fair trial, or refuse to extend to him every right guaranteed by law in the trial of his case for the determination of his guilt. Nothing except the verdict of a jury will deprive a defendant of the presumption of innocence with which the law clothes him, and which hangs like an aegis of protection around him from the very moment he is placed upon trial until the jury have found from the evidence beyond a reasonable doubt that he is guilty. It is the settled rule of this court to disregard all immaterial and harmless errors, and to affirm convictions where the record shows that the appellant was fairly tried and legally proven to be guilty.

In *Byers v. Territory*, 1 Okla. Cr. 704, 103 Pac. 535, this court said:

"When a defendant has been properly charged with an offense and fairly tried, and the evidence clearly establishes his guilt, this court will not reverse the conviction upon any technicality or exception which did not deprive the defendant of a substantial right."

We have repeated substantially the same language hundreds of times since, and a single case cannot be shown where we have affirmed a conviction where an error appeared in the record which affected the actual merits of the case to the injury of the appellant. We always enforce those rules of law which are founded in good conscience and supported by sound judgment. If we were to disregard all rules, whether right or wrong, what would be the use of having an appellate court? It would be better to abolish the right of appeal, and allow each trial judge to

establish such rules as he might desire, either as a matter of caprice or judgment, and to change them as often as he pleased. It would be an outrage on law, a perversion of reason, and a prostitution of justice for this court to affirm a conviction, where the record affirmatively shows that the appellant was not fairly tried, where competent and material evidence in his behalf was excluded and erroneous instructions covering the pivotal points in his case were given to the jury. The doctrine of harmless error was never intended to apply to such a case. This doctrine means precisely what it says; that is, that before a reversal will be entered the errors complained of must reasonably appear from the record to have been harmful to the appellant. But when this is made to appear, no conviction should be permitted to stand. Any other rule would be to encourage carelessness and place a premium on ignorance in the trial of cases, and would often result in great wrong and injustice. The state of Oklahoma is not hunting for victims, but is interested in seeing that every man charged with crime has a fair trial for his life or liberty. Justice will be satisfied with nothing else. It is just as much the duty of this court to see that a defendant who has been unfairly tried should not be sent to the penitentiary as it is our duty to see that those who have been fairly tried and proven to be guilty do not escape punishment on some harmless error. In this way only can the people be taught to respect and rely upon the law.

The record in this case has been separately read by each member of this court, and we are each of the opinion that this is either a case of murder or it is a case of self-defense. The fact that the jury convicted appellant of manslaughter in the first degree, and assessed his punishment at four years in the penitentiary, which is the lowest period under the law, strongly indicates that appellant was injured by the errors committed during his trial, and that, had it not been for these errors, a different verdict would have been rendered. Therefore this is clearly not a case of harmless error.

For the errors hereinbefore pointed out, the judgment of the lower court is reversed, and the cause remanded for a new trial in conformity with the views herein expressed.

ARMSTRONG and DOYLE, JJ., concur.