ROGERS v. STATE

Opinion Filed July 8, 1916.

(158 Pac. 637.)

HOMICIDE—Justification—Self-Defense. The law places too high an
estimate upon human life to justify it being snuffed out by a mere
whim of either cowardice or anger. And where there is nothing
in the facts to justify the accused in believing, at the time of
the homicide, that he was in danger of great bodily harm or his
life was in imminent peril, the plea of self-defense is of no avail.

*Error from District Court, Kay County;
Wm. M. Bowles, Judge.*

Frank B. Rogers was convicted of manslaughter in the first
degree, and brings error. Affirmed.

*W. P. Hackney,* of Winfield, Kan., and *Sam K. Sullivan,*
of Newkirk, and *J. T. Lafferty,* of Kansas City, Mo., for plaintiff
in error.

*Charles West,* Attorney General; *Smith C. Matson,* Assistant
Attorney General; *John Emery,* of Oklahoma City; *C. L. Pink-
ham,* of Newkirk, and *J. S. Burger,* County Attorney of Black-
well, for the State.

BRETT, J.    The plaintiff in error in this case, who will
be referred to as defendant, was convicted in the district court of
Kay county of manslaughter in the first degree, and sentenced
to four years in the penitentiary. The defendant, on February
28, 1910, shot one Ed Conrad, inflicting two wounds from which
Conrad died on March 2, 1910. Defendant, Rogers, was subse-
quently tried and convicted, and appealed to this court; that
judgment was reversed and the cause remanded for a new trial.
*Frank B. Rogers v. State,* 8 Okla. Cr. 226, 127 Pac. 365. A new
trial was had which resulted again in conviction, and from that
judgment the defendant again appeals to this court.

There were errors of law committed in the first trial, which necessitated a reversal; but in the second trial these errors do not recur. There are also material differences between the record now before this court, and the record in the former trial.

The defendant filed a brief in this case of 358 pages, but we find it is of practically no assistance to the court, as it sheds but little, if any, light upon the question as to whether or not the defendant had a fair and legal trial. And in view of this situation, out of an abundance of caution, we have carefully read the voluminous record in this case twice, to satisfy ourselves upon this question. In reference, however, to the brief of the defendant, we perhaps should say it is by no means stale, but on the contrary is a remarkable display of pyrotechnics, and is extremely interesting when viewed from that standpoint. In criticizing county attorneys in general, for urging upon juries that "they owe a duty to the people that can only be honestly discharged by them in the conviction of the defendant," etc., the brief says:

"No more cowardly, vicious, contemptible, and damnable perversion of justice can be perpetrated than by means thus employed; and, unless such practices are stayed by the stern and inflexible interference of courts of appeals, the doctrine of self-defense will be one of the lost rights of humanity, and in time the sturdy, self-reliant and courageous manhood that characterizes the robust and splendid heroes of today will be supplanted by ewe-necked, hollow-chested, Sarah Bernhardt-hipped, spindle-shanked, low-browed, hungry-visaged, measly cadavers, whose progeny will be fit subjects for the experimental, wild-eyed advocates of modern eugenics to practice upon; and the end is not yet."

No one has a greater personal antipathy for the practical workings of the theories of the "wild-eyed advocates of modern eugenics" than the writer of this opinion. But that question, like many others discussed in the defendant's brief, is not involved in this case. The one question in which we are interested, and by which the right of the defeadant to a new trial must be tested, is whether or not in the lower court he had a fair and legal trial.

The deceased was a township official. The defendant, as foreman of a cattle ranch, had fenced up certain public highways.

He had been ordered by the township officials to make gates, so
that the traveling public would not be deprived of the use of
these highways. He failed or neglected to do this. And, under
the direction of deceased, the road overseer cut the fences
obstructing a highway leading through the defendant's inclosure.
As a result of this, bad blood was engendered; deceased con-
stantly insisting that the order directing that gates be placed
across the highways be obeyed, and the defendant, in apparent
defiance of the order, replaced the fences when cut. There is
evidence that deceased threatened the defendant's life, and that
these threats were communicated to the defendant; and the
defendant thereupon armed himself with a revolver. On the
day of the tragedy the two men met upon a public highway, each
on horseback, going in opposite directions. As they were about
to pass each other, deceased reined his horse in close to the
defendant, and struck him a blow with his fist upon his head or
neck. The state's evidence is that both horses then sprang
forward, and the two men were thus separated by some 25 or
30 feet. That defendant turned his horse and began shooting;
that after the shooting began the deceased turned his horse, quar-
tering toward the defendant. Four shots were fired, two taking
effect; one shot seems to have entered the boy of the deceased
about an inch and one-half to the right of the spine, and the other
about the center of the left groin. The deceased was unarmed.
There was evidence offered by defendant to the effect that, after
the deceased struck the blow, he wheeled his horse around, and
was coming toward the defendant at the time he began shooting.
But the physical facts, and the location of the deceased's wounds,
seem to bear out the state's theory that the first shot to take
effect was fired while the back of the deceased was turned toward
the defendant; and that he had turned, quartering toward
defendant when the second shot that took effect was fired. Besides,
the deceased was wholly unarmed, and this fact was clearly appar-
ent to the defendant. It is true that a friend and witness for
the defendant testified that he visited deceased while he lan-
guished in the hospital, and discovered a pair of brass knucks in
his right-hand coat pocket. And it is also true that those knucks

were taken from this pocket of deceased, after his death, by the undertaker. But it was satisfactorily proven that the pockets of deceased had been examined shortly after the shooting, and immediately before he was placed upon the train which took him to the hospital, and no brass knucks were in his pockets at that time. And we presume the jury had no trouble in determining to their satisfaction when, and by whom, these knucks were placed in that pocket. But aside from this no one claims to have seen any knucks during the difficulty; and, while the shooting was going on, the deceased asked defendant to get down off his horse, which should have further assured defendant that he was unarmed and had only anticipated a fist fight, which defendant, with his revolver in hand, could have avoided without even firing a shot.

Do these facts indicate that the defendant was clothed with a right of self-defense? What imminent and immediate danger was he in? And how could he have believed he was in danger of great bodily harm, or his life was in imminent peril, when he, armed with a revolver, saw his adversary 25 or 30 feet away on horseback, unarmed, and inviting him to get down off of his horse, which was tantamount to insisting that they settle their difference by a fist fight? The law places too high an estimate upon human life to justify it being snuffed out by a mere whim of either cowardice or anger. And whether this shooting was done because the defendant, as intimated by his counsel, "was frightened," or whether it was because he was smarting under anger aroused by the blow he had just received from the fist of the deceased, is immaterial; since there was nothing in the circumstances and surroundings to justify his fear, and since homicide perpetrated in a heat of passion, by means of a dangerous weapon, is manslaughter in the first degree.

The instructions given by the court were fair, and fully covered every phase of the case; and there was no prejudical error committed in the trial of the case.

The judgment is affirmed.

DOYLE, P. J., and ARMSTRONG, J., concur.