## STATE OF IOWA v. C. C. BEIRD, Appellant.

**Murder:**  SELF DEFENSE:  WHO AGGRESSOR:  EVIDENCE OF.  On a
prosecution for murder where the homicide occurred in an
affray, and a plea of self defense is made, the question of whc
was the aggressor is material, and as bearing on this question
the defendant may not only show generally that deceased was
of a quarrelsome disposition when intoxicated, but may also
show as a part of the *res gestæ* particular acts of violence to-
ward others, of which defendant had no knowledge, when
committed immediately preceding and continuing to the time
of the affray, as indicating the intention with which deceased
entered into the affray.

**Evidence:**  EXCLUSION OF:  SECOND OFFER.  Where evidence of par-
ticular acts of violence committed by deceased is offered out
of its logical order and is excluded, not because of that fact
but on the ground that it is incompetent, defendant's counsel
is justified in accepting such ruling as final and is not re-
quired to again offer to prove such acts.

*Appeal from Lee District Court.*—HON. H. BANK, JR.,
Judge.

### WEDNESDAY, DECEMBER 17, 1902.

DEFENDANT was indicted for murder in the first degree,
alleged to have been committed by killing one W. A. Dun-
dey by shooting him with a revolver.   On the first trial
the jury disagreed.   On the second trial, defendant was
convicted of manslaughter, and sentenced to imprison-
ment in the penitentiary for six years and six months,
from which sentence he appeals.—*Reversed.*

*Daniel F. Miller* and *James C. Davis* for appellant.

*Charles W. Mullan*, Attorney General, and *Charles
A. Van Vleck*, Assistant Attorney General, for the State.

McCLAIN, J.—The unfortunate encounter between
deceased, who is referred to by some of the witnesses as

"Captain Dundey," and this defendant, occurred during a so-called street fair in the city of Keokuk on the 5th day of October, 1901. The testimony, so far as it is necessary to refer to it for the purpose of discussing the assignments of error which we deem material for a disposition of the case, tended to show the following facts and circumstances leading up to the encounter which resulted in the homicide: The deceased, who was a resident of Nauvoo, Ill., about twelve miles distant from Keokuk, came to the latter city on the 4th day of October, about 8 o'clock in the evening, that being the evening designated, in connection with the street fair, as "Carnival Night." Between that time and midnight he visited several saloons with different friends, had a large number of drinks of whisky, and became considerably intoxicated. Coming out of the last of these saloons, about 1 o'clock a. m. of the same night, he crossed the sidewalk to a street lunch counter owned by one Bland, which he attempted to enter by passing or forcing his way between the proprietor and the defendant, who stood conversing on or near the steps to the car. Words of a hostile nature passed between deceased and defendant, and a scrimmage ensued, during which the deceased struck or struck at defendant with his fists, and received a wound from a ball fired from a revolver which defendant had in his possession just before the scrimmage commenced. There is no evidence of any previous animosity between deceased and defendant, and, so far as appears, defendant was conducting himself in an orderly manner up to the time of the encounter; having previously during the evening drank a number of glasses of beer, but not being, apparently, in an intoxicated condition. With reference to the possession of the revolver by defendant, it should be stated that earlier in the day he had cleaned and loaded it, and carried it in his coat pocket while going about the city, and that it was in his coat pocket when he came from his home upon the main streets of the city to

participate in the festivities of "Carnival Night." His active participation in the festivities consisted in his forming one of a party of masqueraders, but during such time his revolver remained in the pocket of his coat, which was left hanging where he donned his masquerading costume. After the conclusion of the masquerade he had put on his coat, with the revolver in the pocket, and, proceeding toward home, had stopped at the lunch car for the purpose of procuring a lunch, and, while waiting to be served, was holding a conversation with the proprietor of the car, as above stated.

There was evidence in support of two theories of defense: First, that the revolver was accidentally discharged, and that the injury to deceased was without any intention on the part of defendant to shoot the deceased; second, that the revolver was used by defendant for the purpose of shooting deceased in self-defense. There was a conflict in the testimony as to which of the two parties to the encounter was the aggressor, there being some evidence that defendant, after an exchange of hostile words with deceased, seized him by the coat collar and pulled him off the steps of the car, while defendant testified (and there was some evidence to corroborate him) that deceased followed defendant from the steps of the car, striking him two or three times with his fist, inflicting severe personal injuries, before the revolver was discharged. It is shown that deceased was a large and powerful man, while defendant is of not above ordinary stature, and slight in body. Witnesses who saw defendant soon after the encounter testified that he had been badly bruised and beaten; but, on the other hand, it appears that, after the revolver was discharged, deceased threw defendant to the ground, and some of the injuries which the latter received may have resulted from the violence then used.

Under the state of facts thus set out as those which there was evidence tending to support, it is clear that it

was very material, with, reference to the claim that de-

1. SELF defense: who aggressor: evidence of.

fendant acted in self-defense, to know which party made the first assualt upon the other. If defendant was the assailant, then, although

he had no intent to kill or commit great bodily injury, yet, having provoked the encounter, he would be guilty of manslaughter, even though he killed deceased under the supposed necessity of doing so to save himself from death or great bodily harm, unless he had abandoned the conflict and retreated as far as possible; while, if deceased made the first assault in such manner as to threaten defendant with death or great bodily harm, the defendant would have been justified in killing, under the supposed necessity, apparent to him as a reasonable person, for doing so in self-defense. As bearing on this issue, the court allowed the defendant to introduce testimony tending to show that by general reputation the deceased, when under the influence of liquor, was quarrelsome, and that shortly before the affray the deceased was noticeably under the influence of liquor.

Defendant further offered to prove that after deceased left one saloon, about midnight, he went along the street towards the place where the affray occurred, and invited a person with whom he had no previous acquaintance to have a lunch at another lunch car than that above described, and that deceased at that time had a controversy with the owner of the lunch car; further, that, after having gone with this acquaintance to a saloon near by, deceased said, on leaving this place, that he was going to see the Irish; and that he might have trouble up there, and that, if it got too warm, the witness need not stay, at the same time making the remark that he did not like the Irish, anyhow; and that deceased then went to another saloon, kept by one Hickey, which was within three hundred feet of the fatal affray, where deceased threw open the door in a boisterous manner and inquired where a

person was, whom he described with an opprobrious epithet, and as a person who had offered to put him out the night before; further, that later, and prior to the affray, deceased was in the saloon from which he went to the place of the affray, and in that saloon had a heated controversy with a person with whom he was drinking. These offers of evidence by defendant were rejected by the court on the ground that, when the purpose is to show quarrelsomeness or quarrelsome disposition of the deceased, no specific acts can be shown, such as quarrels with third persons and violence towards third persons, but that the evidence must be confined to a reputation for quarrelsomeness.

We have thus indicated the vital question which we find it necessary to decide in determining this appeal. Without evidence that the quarrelsome disposition of deceased while intoxicated was in any way known to the defendant at the time of the affray, the only materiality of evidence as to such quarrelsome disposition was for the purpose of showing which of the parties to the encounter was the aggressor; and for appellant it is insisted that for this purpose acts of aggression towards other persons, committed within a short time before the affray, and in the course of the progress of the deceased toward the scene of the affray, might be shown, in addition to the general reputation for quarrelsome disposition of deceased while intoxicated.    The violent, quarrelsome, or reckless disposition of the deceased, or previous threats of deceased toward the defendant, if in either case known to the defendant at the time of the affray, may be shown in behalf of defendant where self-defense is relied on; and this is under the well-established principle that one who is assaulted and is acting in self-defense is justified in determining, as a reasonable person, the extent of the peril in which he is placed, by taking into consideration the violent character or previous threats of his assailant,

as known to him.  In the application of this principle it has been held that instances or specific acts of violence to others on the part of the deceased, which had come within defendant's observation, or had been communicated to him, may be shown.    *People v. Harris*, 95 Mich. 87 (54 N. W. Rep. 648).

But the ground on which uncommunicated threats or violent and reckless disposition of the deceased, not known to the defendant at the time of the affray, may be shown, is quite different.   Evidence of such threats or disposition is admissible for defendant when the question is who was the aggressor in the affray; the theory being that in case of uncertainty the jury may take such threats or violent and reckless disposition of the deceased into account, as tending to show that he, rather than the defendant, was the aggressor.   That this is the rule as to uncommunicated threats, see *State v. Helm*, 92 Iowa, 540; *Wiggins v. People*, 93 U. S. 465 (23 L. Ed. 491); *People v. Scroggins*, 37 Cal. 676.   As to admissibility of evidence of violent, reckless, or quarrelsome disposition, see *State v. Matthews*, 78 N. C. 523; *Palmore v. State*, 29 Ark. 248, 262; and particularly *State v. Spendlove*, 44 Kan. 1 (24 Pac. Rep. 67), in which the leading cases on the subject are cited and discussed.   Now, if evidence is admissible in such cases tending to show in general a violent, reckless or quarrelsome disposition, it certainly would seem to us that, with equal or even better reason, acts of violence or quarrelsomeness, indicating a state of mind continuing up to the time of the affray, and which would be likely, in ordinary human experience, to lead to aggression and combativeness at that time, might be shown, although the particular acts of violence or quarrelsomeness where not directed towards the defendant personally, provided they were committed under circumstances indicating an existing disposition.   It would seem that such acts, as a part of the course of conduct of the deceased immediately preceding the

affray, and continued up to the time of the affray, would be a part of the *res gestæ* with reference to the intention or disposition with which the affray was entered into by him. That previous conduct of a party charged with a crime, which nearly precedes and is connected with the criminal act may be shown as a part of the *res gestæ*, for the purpose of proving the intention with which the act was done, is unquestionable. See, for instance, *State v. Desmond*, 109 Iowa, 72; *Garner v. State* (Tex. Cr. App.) 64 S. W. Rep. 1044.

There is no apparent reason why the same principle is not applicable to the conduct of the deceased immediately preceding an affray in which he loses his life, where the intent with which he enters into the affray is material. And it has been so held with reference both to acts and declarations of the deceased indicating a violent or aggressive disposition at a time nearly connected with the affray. *People v. Lilly*, 38 Mich. 270, 277; *State v. McNally*, 87 Mo. 644; *Muscoe v. Com.*, 87 Va. 460 (12 S. E. Rep. 790.) And see *State v. Sterrett*, 68 Iowa, 76. It is true that, where the general reputation alone is material, particular acts and conduct with relation to third persons cannot be shown. *State v. Peffers*, 80 Iowa, 580; *State v. Abarr*, 39 Iowa, 185. But these were cases in which the specific acts or declarations sought to be shown were remote from the transaction in question, and not so connected with it as to indicate the disposition or intention with which the party entered into the difficulty. In the case before us, however, the evidence offered was so closely connected with the affray in which the deceased lost his life as to furnish a material indication with reference to the disposition with which the deceased engaged therein.

On behalf of the state it is argued, however, that, to render the disposition or intention of the deceased at the time he met the defendant material, it must first appear that there was some overt act of aggression or violence on

his part, directed toward defendant, for otherwise no
question of self-defense could arise, and that

2. EVIDENCE: exclusion of: second offer.   at the time this evidence was offered no testi-
mony tending to show an overt act of deceased
toward defendant had been introduced; and it is insisted
that therefore the evidence was rightly excluded when
offered, even though it might have been admissible after
the circumstances surrounding the affray had been shown.

But it must be borne in mind that this was a second
trial, and that the general nature of the evidence was al-
ready known to both parties; that defendant might be
allowed, if he saw fit, within the reasonable discretion of
the court, to introduce his evidence out of its logical order;
and that the trial judge expressly based his exclusion of
the offered evidence, not on the ground that no overt act
of assault or aggression on the part of deceased had been
shown, but on the ground that, "when the purpose is to
show the quarrelsomeness or quarrelsome disposition of
the deceased, no specific acts can be shown, such as quar-
rels with third persons and violence towards third per-
sons," and that the evidence must be limited to a "repu-
tation for quarrelsomeness."     Testimony of witnesses
tending to show defendant's reputation in this respect was
admitted at that time, although there would be no more
materiality in reputation than in previous acts or violent
conduct until some overt act of aggression towards defend-
ant was established.

It is plain, therefore, that the court intended to rule
finally on the admissibility of the offered evidence with
reference to defendant's violent conduct preceding the
affray, assuming that there would be evidence introduced
of aggression on his part; and counsel for defendant were
justi ed in accepting this as a final ruling, and in refrain-
ing from making further offer of the same evidence after
the circumstances of the affray had been established.

That there was some evidence tending to show the deceased to have been the aggressor in the encounter with defendant is left without doubt in the record. It will be understood that we are not determining now that deceased was the aggressor, nor that he had been guilty of previous violence or quarrelsomeness; but we are passing only on the question whether the record is such as to show that the offered evidence, if it could be produced, should have been allowed to go to the jury.

As the error in rejecting the offered evidence necessitates a reversal, it is not necessary to discuss other assignments, relating to questions not likely to arise on another trial of the case. The case is remanded for a new trial.— REVERSED.