STATE OF IOWA, Appellee, v. IVAN RHONE, Appellant.

No. 43796.

SEPTEMBER 28, 1937.

Edward L. O'Connor, Attorney General, Charles Van Werden, County Attorney, and Leo C. Percival, for appellee.

Daniel J. Gallery, O. M. Slaymaker, R. E. Killmar, and D. D. Slaymaker, for appellant.

PARSONS, J.— On the 6th day of March, 1936, an indictment was filed in the district court of Madison County, Iowa, against the defendant Ivan Rhone, charging him with the crime of murdering one Sherwood Carney. The plea to the indictment was "Not Guilty", and the case was tried to a court and jury, trial beginning on May 4, 1936, and the defendant was found guilty of manslaughter. The effect of such a verdict is that the defendant cannot again be put on trial for this crime under a degree higher than that of manslaughter.

Ivan Rhone and Sherwood Carney were neighbors, residing on adjoining farms in Madison County. The defendant owned his farm, and had owned it for about five years, the farm adjoining the town plat of Barney, a station on the Great Western Railroad. The town had a very small population. The defendant had lived in that township 43 years, being absent therefrom and living in Nebraska from 1883 to 1892. He weighed about 132 pounds, was five feet six inches tall; age 53 years; his health had been very poor for over seven years following a sick spell which developed into a stroke of paralysis. Rhone lived on his 160-acre farm, batching it for three years. He first met Carney early in 1935, and then saw him again about May 1st of that year, while he was putting cattle in the pasture. The fence between the two farms was practically down, and Rhone went to Carney and told him about it, and told Carney which end of the fence was his. Carney was a tenant of a land bank, owner of the farm, and his tenancy began in 1935.

The Chicago Great Western Railway runs through the Rhone farm, about 40 or 50 acres of the farm lying south of the railroad, the balance on the north of it. There were some buildings on the east side of the farm for stock, but the dwelling house

and appurtenance buildings were on the west end, and on or about the line between the town of Barney and the farm owned by defendant in what would be called the town plat.

The railway also ran through Carney's land, on a grade of sixteen or eighteen feet high. The agent for the federal land bank, which owned Carney's land, agreed to get material so Carney could fix the fence, and sent it down to the farm. About the middle of September, 1935, Rhone walked down to Carney's place, taking a hammer and a spade, and asked Carney if he were ready to put in the fence, and told Carney he was there to help put it in. Carney said he didn't intend to put it in, he was going to work in his beans; he said he was tired of being told about the fence, and if Rhone didn't get out of the way he would give him a damn good whipping. Rhone said, "You are too big a man for me", Carney being a man weighing about 175 or 180 pounds, stockily built, and between 47 and 48 years of age, at least five years younger than the defendant. After Rhone said, "You are too big a man for me", Carney said he would come up on the grade, and he went up on the railroad track, coming up menacingly. Rhone didn't want Carney to hit him, so he ran, and said he was going to call the sheriff; then Carney called him a "son of a bitch" and went into his barn and got something, that Rhone thought might be a gun. Carney said, "I will kill you", and had a corn knife in his hand. He came after Rhone, who kept on running through the corn. After he got home, Rhone then changed his clothes and went to Winterset to see the sheriff, who told him to report the matter to the county attorney, which Rhone did, but nothing was done. After this, whenever Rhone went to the east side of his farm he went on horseback, because he was afraid of Carney, and Rhone hired a man to help him fix the fence, having the man go on Carney's side, and he stayed on his own side. When he went after cattle he had a man go with him. Rhone had been told that Carney intended to kill him. He had heard of the reputation Carney bore in Cass County, from where he came.

One Fred Davis owned some stock, and Rhone heard Carney was going to take care of the stock. Francis Koehler acting for Davis asked Rhone if he could take this stock through his farm, and Rhone said he could; but he said if Carney was taking care of the cattle, he didn't want him on the place. Koehler told Rhone he would have Carney come only as far as the line fence,

and then have him go back. Rhone told Koehler he was afraid of Carney; didn't want anything to do with him; that he was afraid of him and didn't want him on his place; he was afraid that sometime Carney would slip up on him when he was in the field. The next morning Rhone saw Davis and a man named "Fred" pass, and he told them he would not have given permission for the cattle to go through the farm if Carney was to accompany them. At this time the snow was deep. On the morning of February 21, 1936, Rhone saw the cattle being driven from his place. At this time, and before, he testified, that if he wanted to go to the store in Barney he would watch and see that Carney wasn't at the store; that he did this because he did not want to meet him. Rhone's eyesight was not very good, he wore eyeglasses; could not hear much out of one ear. When he got to the gate on the farm he asked if Carney was to be there, and was told he was. He then called out that he did not want Carney on the place; but Carney said he was going through, said it several times. Rhone went to the field, just a short distance from the gate, and when Carney began to come on Rhone backed up; said he was scared. Carney had with him a hammer, an ordinary carpenter's hammer, in his right hand, and an iron bar in his left hand. This bar was about three feet long, must have weighed 8 or 10 pounds; it was curved at one end, with two rather sharp points; the other end having a sharp edge; this bar was used in tearing down fences. Either of these was a deadly weapon, and when struck from the hands of a man of Carney's physical make-up, would be sufficient to kill an ordinary individual if rightly placed. Rhone testified that when Carney began to crowd him he backed up, he was scared. Carney called Rhone a "son of a bitch", and kept crowding him, while Rhone was backing up all the time. Then Carney got up pretty close three different times. Then Rhone saw Carney coming up with a bar in his hands and he didn't know whether he intended to hit him or not, and when Carney drew back his hammer Rhone thought he better do something, and he just pulled the trigger of a gun he had in his hand. This was a small gun with a single barrel, caliber .22, which could be fired but once without reloading. This is Rhone's testimony in the matter.

Rhone knew none of the men with Carney, except Davis, who was on the outside of the gate. Rhone testified he believed it necessary to shoot to save his life. Carney had told him he

would strike him, and had the hammer above his head and was coming straight at Rhone who was moving backward. Rhone further testified that Carney would weigh probably 180 or 185 pounds; that he was well built, a stout and strong man, and was not crippled in any way, and that he (Rhone) was not able to take part in a physical encounter. Rhone said he left the gate and sat down for awhile; then he went over to see his father and mother and tell them what he had done; he told the sheriff, and his deputy took the gun away from Rhone, and took him to Winterset and locked him up in jail. He made substantially the same statement to the sheriff at the time the sheriff took charge of him.

Violet Carney testified that she was the wife of Sherwood Carney; that he was 47 years old when he died; that his usual weight was about 175 pounds; that the altercation took place on Rhone's farm; and that the shot fired struck Carney, piercing his abdomen and went through into the liver. This was on the 21st day of February, 1936, and Carney died on the 5th day of March, 1936.

On the 9th day of June, 1936, a recommendation for mercy was signed by all of the members of the jury, stating among other things, ''From what we learned on the trial of this action, we do not believe that the defendant is a criminal who should be confined in the penitentiary, and so far as his penitentiary sentence is concerned, if the court should see fit to parole him during his good behaviour, we feel that the defendant will have been sufficiently punished and that justice will have been fully served.''

It will be noticed that this recommendation was not returned at the time the verdict was returned, but it was returned before the judgment. This can hardly be taken as a recommendation from the jury, because it was signed and made after the jury had been discharged, so far as this record shows.

█▌█ Evidence was offered by the defense as to the bad character of Carney, and as he had lived in Cass County for some time prior to moving to Madison County, witnesses were called from Cass County. Among these witnesses was P. P. Edwards who testified that he was sheriff, had been chief of police at Atlantic, and was deputy sheriff for awhile when at Anita; he said he knew Carney fairly well, and knew that his reputation was that of being a violent, quarrelsome and dangerous man in the

community where he lived. He was asked the question: "And during the same time were you acquainted with his character, that is, what he really was, as to whether or not he was a violent, quarrelsome, dangerous man?" This was objected to as repetition, and the court sustained the objection.

Ziegler, an attorney at Atlantic, testified that he knew Carney when he lived in his neighborhood; knew Carney's reputation for being a quarrelsome and bad man. When asked the question as to Carney's real character, it was objected to as immaterial, and the objection was sustained.

C. L. Wilson, marshal in Anita for three years, and constable for many years before that; Allen Hayter, who lived three-quarters of a mile east of Carney in Cass County, in 1934, also testified as to the knowledge of Carney's reputation in that neighborhood, as to being a violent, quarrelsome and dangerous man, and that his reputation was bad.

The defense then offered to prove by these witnesses that they were acquainted with the actual character of the deceased before his death; that he bore the reputation of being a quarrelsome and dangerous man. They offered evidence as to his real character, by persons who were personally acquainted with Carney, but the court excluded it, first, on the basis it was simply repetition, that they did not know anything about Carney since he left Cass County in 1934. They must have known him up to the time he left there, which was not very long before the killing.

The defense offered evidence as to the bad character of Carney from Madison County people. One Schoenberger, a township trustee, testified that he was acquainted with the character of the deceased in regard to being a violent, quarrelsome and dangerous man. On cross examination he said Carney threatened to kill him. Carney wanted Schoenberger to make one Kelley turn his hogs loose, and the witness told Carney to pay the damages and he thought Kelley would turn them loose. Carney ripped out an oath and said, "Damn you, I will kill you if you don't go and make Kelley turn them loose"; and Carney kept coming towards him, and he walked off. He said Carney looked bad; but he didn't believe he had a gun.

The encounter which resulted in the shooting took place when some cattle were being driven through the Rhone farm. The cattle belonged to Huntoon of Winterset. Fred Davis, who testified for the state, and had some interest in the stock, had ar-

ranged with Carney to care for the cattle, but he didn't hire him to help drive them.

Francis Koehler, testified that he went to Barney to get the horses and cattle, and went to see Rhone about driving through his farm, and then went to Barney with Huntoon, and as they were walking down the track they saw Rhone. There were six horses and thirty head of cattle. They first met Carney when they got to his place with the stock. Carney brought a hammer and a wrecking bar; the hammer was an ordinary carpenter's hammer, and the wrecking bar was a long instrument of iron, weighing from eight to ten pounds, sharp on each end, with a crook at one end. Either of these were deadly weapons in the hands of a party, and might easily cause death if used violently.

Among the other facts developed was that Rhone told the man who applied to him for permission to take the cattle through the farm that he did not want Carney on his place because he was afraid of him, and didn't want him to get the habit of going through his place. Rhone batched it there alone, and sometimes had considerable money at his place. He also said he would not have given consent for the cattle to go through his place if he had known Carney was to accompany them.

Mr. Davis said when he first saw Rhone he was in the field east of the gate. The first thing he heard was Rhone telling Carney to get back, that he didn't want him on the place. Carney said he wouldn't go back; that he was helping with the cattle, otherwise he would not be on the farm. That Rhone told Carney at least twice to go back; Carney told Rhone several times that he was going through the farm; said if he didn't put down the revolver he would strike him; and when he was told to go back, Carney kept coming on towards Rhone; that he didn't stop until he reached the point where he was shot. The defendant had backed up several feet during the time Carney kept coming toward him.

Koehler testified further that Rhone told him he might take the cattle through on the condition that Carney would not accompany them; that he did not want Carney on the place, because he did not want to have trouble with him, and that was the condition under which Rhone gave them permission to take the cattle across. That he told Carney this, at the gap which was made on the east of the Ivan Rhone place; that would be the far end from the place of the shooting. That he told Carney that

Rhone did not want him to come across. He also testified that on the 21st of February he drove to Barney and walked down the track to Carney's and went to where the stock was; that he and his father intended to take the stock through alone, and then west to the Barcroft farm, and trucks would take them to Winterset; that the way they went it was about a mile from Carney's home to Rhone's home, and that it was at the east line of Rhone's farm where he told Carney that Rhone did not want Carney on his farm.

The court excluded the testimony offered by the defendant tending to show that the deceased, Carney, was a quarrelsome man, and inclined to raise trouble. Several of the witnesses, both from Cass County, where the deceased lived for a few years, and from Madison County, where he was born and was living for a few years prior to his death, testified as to his reputation of being a quarrelsome man.

When the men came with the cattle to Carney's place, and Carney joined them, he was told that Rhone would not permit him to go over his place, so he must have known when he went on Rhone's property that he was doing it against the objections of Rhone.

Several witnesses from Madison County testified as to the reputation of Carney, that he was a quarrelsome and dangerous man. They all said his reputation was bad. The entire number of witnesses from Madison County, all representative men, acquainted with the defendant for years, testified that they were acquainted with Rhone's character, and that he was a good, peaceable citizen, law-abiding. All these witnesses had a long intimate acquaintance with Rhone.

One Jack Robinett, during his testimony, brought out that he had known Sherwood Carney a short time, and had a talk with him December 16, 1934, and that Carney said at that time that Barney must be a hell of a place to live in; that he had asked one of his neighbors to help him thresh, and this neighbor told him he did not have any threshing to do. Then he said his cattle got into Rhone's pasture and that Rhone came down and raised a fuss with him. That Carney said he wouldn't have thought much about it if Rhone's stuff had got in on his place. The witness said to Carney that he expected Rhone would rather have Carney's stuff on him than his stuff on Carney; that that was the kind of a fellow he was; he wanted his stuff at home; and

Carney said that Rhone must be a hell of a fellow. Robinett said that Carney said he would kill Rhone if he ever crossed his path again; he swore when he said it; that if Rhone ever crossed his path again he would be damned if he would not kill him; that he had had some trouble with Rhone in the fall, but he was so mad he didn't remember just how it happened.

True St. John testified that he had conversations with Carney in Winterset in the fall of 1935, and that Carney said he had run Ivan Rhone home with the corn knife, and said he would have killed Rhone if he had caught him.

One Beverlin, who came up while the conversation was going on with St. John, and who heard Carney say he had run Rhone up over the railroad with the corn knife, said Carney said he would have caught him if he hadn't dodged into the cornfield.

At the close of all the evidence the defendant moved the court to direct a verdict for the defendant upon several grounds, which we will not discuss as we do not think they are necessary for the determination of this case.

A reading of the evidence convinces one that Carney was no angel of peace; that he was rough, that he was a strong man and he knew it; that he didn't hesitate to bully somebody who was weak, like the defendant in this case; that he went on to Rhone's place with the knowledge that he had been forbidden to cross it. Notwithstanding he said he was going to Barney to get something for his wife, Carney could just as well have gone by the way of the railroad track as by crossing Rhone's land; and Rhone would be justified in believing, as Carney came on his place armed with the tools he had with him, that he meant harm; that he came for trouble. And one cannot help arriving at this conclusion, after reading this record. The deceased "Sowed the wind, and reaped the whirlwind."

It is also noticed that notwithstanding this record, showing what it did of the character of Carney, as to his overbearing disposition, his quarrelsomeness, and his general disregard for the rights of others, that not one single person at any place he had ever lived was called to the witness stand to say that his reputation or actual character was good, which might have been shown in rebuttal to this evidence of the defense. On the other hand, Rhone had neighbor after neighbor, who had known him years, men of responsibility, testify to his good character, to his peace-

able disposition, and not one witness was called by the State to rebut this presumption of the good character of the defendant.

These things are not mentioned for the purpose of showing that you may kill a turbulent, overbearing, unruly and brutal man at will, but they are set out here to show what one can about the parties to such an affray; that the door is open to show everything that bears upon the subject, and that it is right that this should be done, if there is conflict of evidence. The defense is self-defense. Rhone was protecting his own rights; he had a right to go any place he saw fit on those premises, for they were his, under his own personal control and dominion. The law guarantees him protection, and the law gives him the right to protect himself in the possession of his own property, and in protesting and objecting to anyone disturbing him in that possession when an intruder, who had been forbidden to come on the property, without any right, merely to gratify his own spleen, and perhaps spite, trespasses, and enters onto the property at his peril, he is the aggressor; and especially so, when he goes on forbidden property armed, as Carney was, with two death-dealing implements in a close encounter. Carney was close enough to Rhone, at the time of the shooting, that he could have hit him with a very slight effort, with either the hammer or the iron bar, and a strike from either might well have been fatal. A man, knowing of his own physical weakness, placed in the position in which Rhone was placed, undertaking to prevent Carney from coming upon his place where he lived, where he stayed nights, where he batched it alone, and at many times had considerable money about the place, knew that Carney was there for no good purpose. Rhone owned the land; it was in his undisputed possession. Carney, or anyone else, had no right after being forbidden to come on the land, to trespass. Rhone had the right to tell him to get off; he told him he couldn't cross the property, and we must say that under the record here, with the character and disposition of Carney, that it would be far-fetched to say that he went on there with peace in his mind; and Rhone had the right to protect his own property, and the right to protect and object to anyone disturbing him in that possession.

In State v. Thompson, 49 Or. 46, 88 Pac. 583, 124 Am. St. Rep. 1015, the note covering fine print in the American State Report, from pages 1018 to 1035, discusses thoroughly the rules by which the right of showing character, and the manner in

which it is done. At page 1020 of 124 Am. St. Rep., in speaking of the defendant, the court said:

"The basic principle in cases of this sort is stated in the most general terms in one of the earliest cases in which it was ever ruled that evidence of decedent's bad character or reputation could be admitted for any purpose whatever, namely: Monroe v. State, 5 Ga. 85, where it was said that 'in cases of doubt, whether the homicide was perpetrated in malice, or from a principle of self-preservation, it is proper to admit any testimony calculated to illustrate to the jury, the motive by which the prisoner was actuated'; and the same principle, applied to the conduct of the deceased, was expressed in one of the later of the leading cases as follows: 'Evidence of the violent and dangerous character of the deceased is admissible to show, or as tending to show, that a defendant has acted in self-defense; or in other words, under such circumstances as would have naturally caused a man of ordinary reason to believe that he was, at the time of the killing, in imminent danger of losing his life or suffering great bodily harm at the hands of the deceased.' "

At page 1021 of this report, speaking of the original development of the rule, the note says:

"The rule as above stated, though at the present time well established, is of comparatively recent origin, and in several of the earlier cases, where the point was raised, it was either denied in toto or held applicable only in cases where the evidence is wholly circumstantial."

 The rule is further laid down, on page 1026, of 124 Am. St. Rep., as follows:

"The bad character or reputation of the deceased, when proven, and for the purpose of proof, is to be taken and treated and considered as a part of the res gestae."

And again on page 1027, of 124 Am. St. Rep., the rule is laid down:

"This presumptively good character and reputation of the deceased for peaceableness cannot be put in issue by the defendant in the absence of any evidence showing, or tending to show, a case of self-defense."

Again the rule is laid down on page 1028, of 124 Am. St.

1232

Rep., quoting from Garner v. State, 28 Fla. 113, 9 So. 835, 29 Am. St. Rep. 232, where it was held:

"If there is the slightest evidence tending to prove a hostile demonstration which may be reasonably regarded as placing the accused apparently, in imminent danger of losing his life or sustaining great bodily harm, the threats should not be excluded."

And the note sums up by saying:

"From these two cases may be deduced a general rule to the effect that if there is the slightest evidence reasonably tending to show that the killing was in self-defense, evidence of the violent and dangerous character of the deceased should be admitted."

■■ On page 1030 of 124 Am. St. Rep., the note says:

"The knowledge of the defendant, actual or presumptive, of the bad character or reputation of the deceased may be established in either of four ways, namely: (A) by proof of defendant's knowledge of decedent's actual character and disposition, acquired by personal observation and experience; (B) by information communicated to him by others; (C) by proof of defendant's actual knowledge, in common with others, of the general reputation of the deceased in the community in which he lived; and (D) by proving, first, the bad reputation of the deceased, and, secondly, a long and intimate acquaintanceship between defendant and deceased, or, the fact that defendant was a resident of the same community in which the deceased lived, from which it will be presumed that what was generally known in that community was known also to the defendant."

Again the note says:

"The defendant may show by his own testimony his knowledge of the decedent's actual character and disposition, acquired by personal observation and experience."

Also: "Defendant may show that he was informed by others, prior to the homicide, of the decedent's violent and dangerous character, or reputation." Or: "The defendant may have been personally unacquainted with the deceased, and yet have had, in common with others, a thorough knowledge of his bad reputation in the community in which he lived, and if so, he may establish that fact by his own testimony." And: "The defendant may prove an intimate acquaintanceship with the deceased,

* * * or, he may prove, first, the bad reputation of the deceased in the community in which he lived, and, secondly, the fact that he, the defendant, was a resident of the same community—from which it will be presumed that what was generally known in that community was known also to the defendant."

Speaking of the rule as to the defendant, in a late case, State v. Ferguson, 222 Iowa 1148, 270 N. W. 874, 882, the court speaking by Justice Donegan, says:

"It also seems well established that the good character offered by an accused may and must relate particularly to that trait of character which is involved in the crime charged." Citing authorities. It also says: "It is true that in some jurisdictions witnesses are confined to testimony as to the general reputation of the defendant, and cannot testify as to what they know of the defendant, or as to his disposition, or give their opinion as to his character or disposition, from their personal observation or experience." But says: "In this state, however, the rule seems to be otherwise, and the real character of the defendant may be shown. This may be shown, it is true, by general reputation, but it may also be shown by what a witness knows of the defendant from his personal observation or experience with him." Citing five other Iowa cases.

■■■ It is held: "If a person honestly believes, or has reason to believe at the time of the shooting, that he is in great peril and great bodily harm is about to be inflicted upon him, he has a right to act under such well grounded apprehension. The danger need not in fact exist." State v. Brooks, 192 Iowa 1107, 1117, 186 N. W. 46, 51, citing State v. Fraunburg, 40 Iowa 555; State v. Abarr, 39 Iowa 185; State v. Collins, 32 Iowa 36.

The Brooks case was written by a Judge of this Court who had had great experience in criminal cases as a prosecutor, Hon. Lawrence De Graff. He had been an assistant attorney general, handling criminal prosecution; was assistant county attorney of Polk County, and county attorney, judge of the district court, and an honored member of this Court for years.

To the case of Cain v. Skillin, 219 Ala. 228, 121 So. 521, 64 A. L. R. 1022, is appended a note dealing with the question of reputation for turbulence—admissibility. This note covers pages from 1029 to 1047, inclusive, and fully discusses the matter. The result of an examination of that note will show that the authori-

ties generally, at this time, agree that both the evidence of reputation, and the evidence of actual character, are admissible in cases of this character. And on principle we cannot see why this is not true. Reputation is simply what people in a neighborhood say of one, tending to establish his character. If that is admissible to establish character, we can see no reason why the observations of persons intimately acquainted with a person cannot establish the fact of his actual character, and why it is not more preferable than the mere reputation. Persons acquainted with him intimately may know his actual character, that it may be different from his reputed character; malicious persons may have spread false rumors, so skillfully, that one may be a person of real bad repute, and yet, those intimate with him may know his actual character to be good. Actual knowledge of character may be and sometimes is much more preferable to mere repute. Hence, there is good reason for admitting evidence of persons who know the actual character. Both classes of testimony in cases of this character are admissible.

█ █ The State makes something in this case of the fact that the defendant was armed with a deadly weapon, which was a small single barrel .22 caliber pistol.

We desire simply to call attention to our statutes upon the subject of weapons, firearms, etc., in chapter 564, of the Code. Section 12936, the one forbidding the carrying of deadly weapons about the person, concealed, forbids such carrying in all places, "except in his own dwelling house or place of business or other land possessed by him." And in the same section it forbids the carrying of firearms in a vehicle operated by him, with the same limitations.

So the defendant had the right, as he was on his own premises, on land possessed by him, to carry a weapon in whatever manner he might desire.

There are many other questions discussed in this case which we have not undertaken to answer, for the reason that we think this case should be reversed for the failure of the court to permit testimony as to the actual character of the deceased, in regard to turbulence, violence, and matters of that kind. For that reason, the case is reversed.—Reversed.

RICHARDS, STIGER, DONEGAN, KINTZINGER, MITCHELL, SAGER, and ANDERSON, JJ., concur.