STATE OF IOWA. Appellee, v. ALBERT WILSON, Appellant.

No. 46312.

JUNE 19, 1945.

McCoy & McCoy and Eichhorn & Gilbert, all of Oskaloosa, and Schuyler W. Livingston and T. L. Brookhart, both of Washington, for appellant.

430

John M. Rankin, Attorney General, Charles H. Scholz, Assistant Attorney General, James L. Devitt, County Attorney, and William M. Spencer, Special Assistant Attorney, of Oskaloosa, for appellee.

BLISS, J.—■ On October 19, 1942, the appellant, Albert Wilson, and his brothers Glenn and Clarence were jointly indicted by the grand jury of Mahaska county for the crime of murder, in that they did "wilfully, deliberately, feloniously, and with premeditation and malice aforethought, and with specific intent to kill, murder one Harry Bolden," on June 15, 1942. They were tried separately. Glenn was found guilty on December 2, 1942, of murder in the first degree. The judgment on the verdict was reversed. State v. Glenn Wilson, 234 Iowa 60, 11 N. W. 2d 737. It appears from the arguments in this appeal that Glenn was tried on the charge of manslaughter, under the indictment, and acquitted by the jury on December 6, 1944, because he killed in self-defense. Albert was tried for murder and the jury on February 4, 1943, found him guilty of manslaughter. Clarence was later tried under the indictment and on April 2, 1943, was found guilty of manslaughter. On his appeal this judgment was reversed. State v. Clarence Wilson, 235 Iowa 538, 17 N. W. 2d 138.

Appellant asks for a reversal because of two errors of the court, the first one being the court's refusal to permit him to offer evidence that the general reputation of the deceased as a quarrelsome man in the community in which he lived at and prior to June 15, 1942, was bad.

The second error was the admission by the court of certain oral declarations of Glenn Wilson, and also his written statement, setting out his participation in the killing of Bolden and matters leading up to it, including the striking of Bolden with a club. All of these statements were made after the homicide and not in the presence of Albert Wilson. The admission of the testimony was objected to as being hearsay and incompetent.

The evidence of what took place on this occasion was more fully gone into in the trial of Glenn Wilson and is set out in our opinion on that appeal. (234 Iowa 60, 11 N. W. 2d 737.) The principles of law involved in both of the assigned errors were

fully discussed and stated in our opinion in State v. Clarence Wilson, 235 Iowa 538, 17 N. W. 2d 138, and sustain the contentions of the appellant with respect to the law applicable thereto. The same errors were assigned by Clarence Wilson on his appeal and the judgment was reversed because of those errors. But on this appeal the State contends that certain matters of fact render those principles of law inapplicable. It is therefore necessary to state the pertinent evidence, as shown by the record in this case, bearing upon the first assigned error.

I. There was evidence of the following matters: The three Wilson brothers, immediately prior to Monday, June 15, 1942, had returned from Cleveland, where they had been working in the shipyards, to Oskaloosa, preparatory to entering the military service. Albert was forty-one years old. He enlisted in that service on October 3, 1942. Glenn was thirty-eight. About midafternoon on Monday, Glenn purchased some whisky and the three Wilsons, Andrew Rogers, a colored unmarried man, and Ballinger and McFarland, rode in a car of one of the Wilsons to the Rogers' two-room house. The party continued until in the evening. Sometime between eight and nine o'clock, Bolden, a colored man about forty-four years old, called at the Rogers home to get a suitcase. He asked for a drink and Glenn told him to help himself. He did so. There was considerable drinking, bragging, and some quarreling. They discussed horse racing, baseball, and prize fights. Bolden said he had whipped Kenneth Brown and his whole family. He said he was the best man in the house and no one challenged his statement. He and Glenn had an argument and he told Glenn how tough he (Bolden) was and threatened to stick his knife into him. Shortly after nine o'clock Glenn proposed to Albert that they go home. Albert at once arose and went out the door and Glenn followed him and they started across the yard to the Wilson car parked about thirty-five feet from the house. Bolden followed Glenn outside the house and the argument was continued. Albert did not know that Bolden had followed Glenn out but when he reached the car he heard a commotion behind him and saw Glenn and Bolden wrestling on the ground. He went back and helped to separate them and saw them get on their feet. Rogers, Ballinger, McFarland, and Clarence Wilson remained in the house

after Glenn and Albert and Bolden left. Rogers heard noises and talking outside, and said to Clarence, "Let's go out and see what is the matter." They went outside and saw Glenn, Bolden, and Albert on the ground near a flower bed about seventeen feet from the house. Rogers said they were doing nothing but hugging each other and Clarence tapped Albert on the shoulder and asked him what they were doing and to get up. They got up and Albert put his hand on Bolden's shoulder and they walked southeast a way and turned west toward the rear of the car, which was headed north. They went behind the car and out of sight of Rogers. Rogers did not see Glenn during this time. Rogers and Clarence then walked to the front of the car and to the west side of it near the coal house. Rogers did not see Bolden and Al but he could hear them talking. He could not understand all they said but he remembered the exact words of Bolden, who said: "Well, if this is the way, I will turn some of your guts out." Rogers did not see Bolden or Al or Glenn at this time. But shortly after he heard the **remark of Bolden,** Rogers saw Glenn as he pushed between Rogers and Clarence, who is crippled, knocking Clarence down as he stood up against the coal house about three feet away. As a part of its case in chief, the State read into the record Albert's testimony in the Glenn Wilson case. It, also, shows that after Glenn and Bolden arose from their scuffle Albert and Bolden walked over back of the car and Bolden picked up a club and said he was going to knock the head off of somebody and Albert ran away. Soon after, he heard Clarence calling that he needed help. He came back and saw Bolden lying on the ground and Glenn was leaning against the east side of the car holding his right arm with his left hand. He and McFarland and Rogers carried Bolden into the house. Rogers testified that when Glenn pushed in between him and Clarence, knocking the latter down, he had a club in his hand and when he raised it to strike, Rogers ducked out of the way and went to the southeast corner of the house. Just before Glenn's appearance with the club he and Bolden had been out of sight behind the car. As Rogers retreated he heard a sound like a blow but did not see or know what was struck. He went back and saw Glenn, Clarence, and Albert standing, and Bolden lying face up on the ground. He then went to the house

to call McFarland. Albert then helped Glenn into the car and they drove to a lunchroom about three blocks away and Albert put in a call for the police and an ambulance and he and Glenn then returned to the Rogers home. The telephone call is confirmed by the proprietor of the lunchroom and by the police night clerk. The peace officers arrived shortly and Nevins testified that he heard Glenn tell Mapes, deputy sheriff, that Bolden hit him with a club and he took the club away from Bolden and hit him with it. Nevins then searched the backyard and found a bloody spot on the ground where Bolden had been lying, and near by a pocketknife which Mrs. Bolden identified as belonging to her husband. Near by he found a club, rather round, with a flat side. These articles and the spot of blood (six by eight inches) were near the coal shed. The club was broken into two pieces. The jagged ends matched. There was some blood on the short piece, Exhibit B, about eight inches from one end. Nevins examined the body and saw a wound just back of the crown of the head. Heslinga, another officer, also saw "a wound" on the head. Van Genderen, the sheriff, testified that Glenn told him that night that Exhibit B must have been the club he hit Bolden with. He said there was a "big gash or cut on the back of Bolden's head." He was present when Nevins picked up the knife and club near the bloody spot. On the "flat edge" of the club was a blood spot with hairs clinging to the club. These were hairs from Bolden's head. Dr. Catterson, the coroner, examined the body at the Rogers home and at the funeral parlors. He said the scalp wound was about three inches long, and that the blow caused death instantaneously. He examined the body completely and found no marks of any significance other than the scalp wound. At the sheriff's office the next morning after the homicide a written statement, Exhibit E, was signed and sworn to by Glenn. Albert was not present. The State introduced it in evidence, over objection. It contains this statement, among others heretofore noted:

"Bolden picked up a stick and hit me on the right shoulder and forearm and back of the right ear. I took the stick away from him and held it in one hand, my left hand, I am naturally left handed, and I struck him on the head with this stick. After

I struck Bolden he dropped to the ground and from the fact of being struck on the head I don't remember what happened after that, but I do know that I only struck him once."

All of the evidence noted above was put into the record by the State in its case in chief. Van Genderen, a State's witness, testifying for the defense, stated that he had examined Glenn rather casually, at the jail on June 16th, and found his right forearm bruised and with some abrasions. He did not observe particularly the upper arm. He saw a swelling back of his ear and extending to the hairline. He said "it would be hard to describe how big it was but it was a noticeable swelling."

In the opening statement to the jury the defense stated:

"In this case the defense will show that the defendant, Al Wilson, is not guilty as charged. The defense will show, if you please, ladies and gentlemen of the jury, that the negro involved in this case was a man who was unusually race conscious. And as we proceed with our evidence in this case we will show he was a man of violent temper and dangerous. That over a great many years he was always ready to assume insult of the negro race where no insult was intended. We will show you acts of violence on his part and we will show you the facts and circumstances of incidents of the night or evening of June 15, 1942."

Immediately after the testimony of Van Genderen, noted just above, the defense called Oscar Raines, a qualified witness on the matter, and asked him the general-reputation question referred to in assigned error one. The State objected "as being wholly incompetent and immaterial, and further assuming a set of facts not shown in this record, the question is also improper as to form." The judge then called the attorneys into his chambers and inquired of the assistant attorney for the State the theory of his objection. He replied:

"The theory of the State that any evidence with reference to the general reputation of Harry Bolden in the community in which he lived on or prior to June 15, 1942, is incompetent and immaterial in the trial of this case, it not being shown at this time or yet claimed that the defendant, Albert Wilson, was acting in what he did, if anything, in defense of himself or of his

brother, Glenn Wilson, so that at this time the evidence is not competent for any purpose whatsoever and would be prejudicial to the rights of the State if the same was admitted at this time and had to be stricken later from the record because of the possible failure to connect up the same in the later evidence of the defendant.  Court: Is that all?  Mr. Spencer: Yes sir. Court: Now, Mr. Talbott, have you any statement to make in the record for the benefit of the Court and the record as to what your theory is in offering this testimony at this time? * * * Mr. Talbott: The defendant is offering this evidence on the theory that there was no crime committed at the time and place alleged in the indictment and it is material upon the question as to whether there was a crime committed.  Court: I ask you, Mr. Talbott, at this time whether you expect to connect this evidence up later by showing that what, if anything, this defendant did, was done in defense of either his brother or himself? * * * Mr. Talbott: We will say this, that we do not at this time propose or say to counsel for the State or the Court that this evidence will be connected up with any conduct upon the part of the defendant, Albert Wilson, but we think it is admissible upon the record as it now is.  Court: Now, gentlemen, it is the Court's opinion that the competency of this testimony is to be ruled upon by the Court in the light of the statement of counsel now made in the record as to whether or not it is going to be connected up later by evidence to the effect or tending to show that this defendant either acted in defense of himself or either of his brothers.  The Court takes the view and so advises counsel that this defendant is on trial as a principal and is indicted as a principal and that it is incompetent for him to show that a co-defendant not now on trial was acting in self-defense unless he goes further and states that he was coming to the assistance of his brother or brothers.  However, the Court wishes counsel to understand that this testimony would be competent in the Court's judgment and would be admitted by the Court if the Court were advised that the defendant was taking the position that he was acting in either defense of himself or in the defense of either of his brothers, or both of them, but that it is not defensive matter, nor competent evidence, if offered for the purpose of showing that the brother, Glenn Wilson, a co-defendant, was

acting in justifiable self-defense and therefore he could not be guilty of aiding him or abetting him in the commission of a crime, if a crime was committed. In other words the Court feels that this defendant is now on trial as a principal and that the guilt or innocence of another defendant, a co-defendant not now on trial, is not conclusive on the question of the guilt or innocence of this defendant. Therefore the Court sustains the objection to the question asked of the witness, Oscar Raines. [Defendant excepts.]''

The appellant offered proof that Bolden's general reputation for the trait inquired about in the community where he lived at the time in question was bad. The State objected about as before.

Back in the courtroom the defense put on two other such reputation witnesses. The court stated:

''The State objects for the reason that it is incompetent and immaterial for the reason that it does not appear of record at this time that the defendant, Albert Wilson, was acting either in defense of himself, or in defense of either of his brothers, or both of them, nor that he personally knew of such reputation of the deceased, Harry Bolden, if the said Harry Bolden had such a reputation and therefore it is not competent for any purpose and for the further reason that the question assumes a set of facts not shown to exist in the record as to whether or not the deceased, Harry Bolden, had a general reputation in the community in which he lived prior to the time of his death with reference to being a quarrelsome man or otherwise. [Objection sustained and the defendant excepts.]''

To the offer of proof on one of the witnesses, the court stated:

''The objection to the offer is sustained, *and as the Court indicated in the Court's judgment it is prematurely offered.*''

The italicized words clearly show that the prematurity of the offer was because no evidence of Albert's participation in any defense of himself or Glenn had yet been shown, and not with the thought that the showing of aggression on the part of Bolden was insufficient. Neither did any objection of the ap-

pellee state the latter thought. The offer was not prematurely made for any reason.

The defense then introduced the testimony of Dr. Day, who examined Glenn on July 16th, the day following the homicide. Refreshing his memory from his history sheet, he testified:

"Upon physical examination, I found a large bruise between the wrist and the elbow joints on the right forearm, with some abrasion of the skin, a moderately large bruise and swelling on the right forearm, between the elbow and shoulder joints, and a large bruise, a swelling about the size of a hen's egg behind the right ear, with some abrasement of the skin, and a bruise and abrasion on the angle of the left jaw."

He said abrasion meant a slight bleeding. There was small blood on the arm bruises. The undertaker who bathed and prepared the body for burial, when asked to describe to the jury the wounds or bruises or marks that appeared on the body, said: "Well, the only mark was an *incision* right on the back of the head." He noticed no other wounds and bruises on the body. The State did not cross-examine.

The State put on the stand the five children and Golda Morgan, on whom it relied for a conviction. They were its key witnesses in the three trials that have been presented to us. The appellee states to us:

"The State expects the Court to determine this case solely upon the evidence as shown by the record herein and not upon any purported evidence or facts as stated in the other two Wilson cases."

Without deciding whether and to what extent this court may take notice of matters in our records of appeals in cases growing out of the same transaction, we may assure the State that its injunction has been strictly followed and our decision is based solely on the record herein. It was not necessary to go beyond it. But the State has also said that it denies that the evidence in the three cases is the same. We do not take issue with this statement but we may comment thereon. The witnesses have been the same, with unimportant exceptions, in the three cases. There should be no wide variation in their evi-

dence, except as may be for lapses of memory in minor details. The court is familiar with the records and the evidence in the three cases and the writer has read the transcripts of the reporters in them. In the Glenn Wilson opinion the court said, 234 Iowa 96, 11 N. W. 2d 755:

"The evidence upon which the State relies to sustain the verdict and judgment is the testimony of the Stewart sisters, Charlotte Phipps, and Golda Morgan. We have already stated that their testimony respecting the beating which they say Bolden received is incredible because of its inconsistencies and its complete refutation by the physical facts as shown by the single wound on the body of Bolden."

The chief difference in the evidential records of the three cases is in the modification of the testimony of the Stewart girls and the Phipps girl, and that modification in one particular is that their testimony clashes far less with the undisputed physical fact—the single cut on Bolden's head and no other injuries—in this case than in Glenn's case. Those witnesses in that case had Glenn making a veritable chopping block out of Bolden. Juanita Stewart, who admitted in both cases that she did not tell the truth to appellant's attorneys when they were investigating the case preparatory to trial, testified that her attention was first attracted by seeing about six men, four white and two colored, come out of Rogers' house, and one white man and a colored man began wrestling on the ground; that Mr. Padgett then called his children and she and all of the children went to the Padgett home about half a block away, with the two men still on the ground. It took two or three minutes to walk up there and they sat on the porch for several minutes and after hearing three blows struck she went back to the Rogers place. She said she was gone five or ten minutes or more. She testified that she saw the white man striking Bolden about twenty times, "awful hard on the head." She testified that after she came back, Golda Morgan came out close to where she was and stayed about half an hour, and "this fighting was going on all of that time."

On this trial she had no memory of how long the beating continued, whether it was ten minutes or a half minute. She had no recollection of how many blows were struck. She did say

that Bolden was lying without moving, with his face up. Yet there was no mark upon the face, the chest, limbs, or body of Bolden when the beating ceased. She questioned the accuracy of the transcript of her testimony in Glenn's case. Her examination, covering fifty-six pages of the transcript, does not enhance her veracity or add to the credibility of her testimony in either case.

Charlotte Phipps, in Glenn's case, testified that a negro was on the ground and:

"The man I saw using the club was hitting the man many times. He hit him with the club and kept on hitting, just like he was chopping wood or something. He was already doing it when I got there. He was still at it when I left. I stayed there for several minutes."

She saw no other man near the man on the ground except the one who was beating him. At the trial in this case she merely testified that she saw a man hitting a man on the ground with a club. She saw nobody holding the man who was beaten, contrary to the contention of the State and the testimony of some of the girls. She did not see Juanita Stewart there at any time. Juanita admitted she had told attorneys for the defense, when they were investigating, that she did not return to the Rogers place after she went to the Padgett home, which was before any blow was struck with a club.

But there *is* testimony at this trial that Bolden was severely beaten—so much beaten that the testimony cannot reasonably be reconciled with the physical facts. Lillian Stewart testified that the white man beat the colored man on his head for about five minutes with a club like a ball bat as he lay face upward on the ground and two white men on their knees held him. Lillian did not see Golda Morgan either in her own yard or in the street. Golda was an adult woman who kept house for Mr. Dowd, who lived across the street just south of the Rogers house. She testified that she stood a short distance west of the northwest corner of her kitchen about opposite the Rogers coal house, and saw two white men standing up holding a colored man, who also was standing up, while a white man stood by swinging a club over his shoulder, holding the club with both hands, striking the negro,

blow after blow, for seven or eight minutes. All of the blows were on the left arm and shoulder and none was on the head. These men never moved their position but stayed behind the car. The negro tried to get loose but he could not. The beating continued all of the time she watched them. They were still fighting when she left to sit on the porch on the south side of the house. The negro and all of the white men were on their feet when she last saw them as she left.

There was more evidence tending to show self-defense on the part of Glenn than in the case against Clarence, and much less evidence of beating Bolden in the latter case. Our opinion in that case [State v. Clarence Wilson, 235 Iowa 538, 17 N. W. 2d 143] states that the witnesses "did not say that more than one blow was struck."

We have fairly set out the evidential record with the objections and rulings respecting this error. The court's rulings were clearly erroneous and distinctly prejudicial. In the light of that record there is no basis for the repeated statements in the argument of the State that, considering the State's evidence as a whole, there is not a scintilla of evidence even suggesting that Glenn Wilson might possibly have acted in self-defense, or that Bolden was ever armed with a club. It is a well-settled principle that, under certain recognized conditions and circumstances, one may defend himself against death or great bodily harm. And if a homicide results, the one criminally charged therewith may support that defense by evidence of all the circumstances of the transaction, including any threats of deceased, acts of aggression, hostile demonstration, or overt attack, sufficient to arouse a reasonable belief in the accused of apparent imminent danger to his life or of great bodily harm to him. The character or reputation of the deceased for being a violent, quarrelsome person may well have added to the apprehension of the accused. As Wigmore has said:

"When the issue of self-defense is made in a trial for homicide, and thus a controversy arises *whether the deceased was the aggressor,* one's persuasion will be more or less affected by the character of the deceased; it may throw much light on the prob-

abilities of the deceased's action.'' Wigmore on Evidence, Third Ed., section 63.

Before evidence of this character or trait is admissible there must have been some preliminary foundation laid, some evidence already introduced of hostile demonstration, or some overt act of aggression or violence on the part of the deceased directed toward defendant. Or, as Wigmore, in the same section supra, said:

"There ought, of course, to be some other appreciable evidence of the deceased's aggression, for the character-evidence can hardly be of value unless there is otherwise a fair possibility of doubt on the point * * *.''

This preliminary evidence need not establish the hostility or aggression. It is necessary only that it tend to establish it, that there may be some doubt about the matter, in order to permit the introduction of character or reputation evidence. This matter was ably discussed by Justice Parsons, in State v. Rhone, 223 Iowa 1221, 1230, 275 N. W. 109, 114, in which there was a reversal for rejecting character testimony. The court quotes at length with approval from the annotation to State v. Thompson, 49 Or. 46, 88 P. 53, in 124 Am. St. Rep. 1015 et seq., loc. cit. 1230. After stating some evidence bearing on the question, the court states that these matters ''are set out here to show what one can about the parties to such an affray; that the door is open to show everything that bears upon the subject, and that it is right that this should be done, if there is a conflict of evidence.''

Quoting from page 1028 of 124 Am. St. Rep., this court states, on page 1232 of 223 Iowa, page 115 of 275 N. W.:

"And the note sums up by saying: 'From these two cases may be deduced a general rule to the effect that if there is the slightest evidence reasonably tending to show that the killing was in self-defense, evidence of the violent and dangerous character of the deceased should be admitted.' ''

See, also, 26 Am. Jur., Homicide, sections 338–345; State v. Yates, 132 Iowa 475, 479, 109 N. W. 1005; annotation 64 A. L. R. 1029 et seq.; 40 C. J. S., Homicide, section 272; State

v. Buford, 158 Iowa 173, 174, 175, 139 N. W. 464; State v. Brooks, 192 Iowa 1107, 1117, 186 N. W. 46; State v. Beird, 118 Iowa 474–482, 92 N. W. 694; State v. Kelly, 196 Iowa 897, 902, 195 N. W. 614; State v. Clarence Wilson, supra, 235 Iowa 538, 544, 17 N. W. 2d 138, 142.

The preliminary showing in this case far exceeded the minimum required by the above-cited authorities. It was much more conclusive than having a mere "bearing" on the question, as required in State v. Kelly, supra. As noted in State v. Beird, supra, 118 Iowa 474, 482, 92 N. W. 694, 697:

"That there was some evidence tending to show the deceased to have been the aggressor in the encounter with defendant is left without doubt in the record."

It is immaterial whether the foundation was laid in the evidence of the State or in that of the appellant. State v. Porter, 34 Iowa 131, 140; State v. Yates, supra, 132 Iowa 475, 479, 109 N. W. 1005.

The evidence shows Bolden's quarrelsome disposition in the Rogers house, his confidence and pride in his physical prowess, his bragging of whipping a family, his challenge that he was the best man in the house, his quarrel with Glenn, his threat to stick a knife in him, his pursuit of Glenn when he peaceably left the house to go home, his following Glenn to the car after being separated in the encounter on the ground, his threat to knock somebody's head off, his threat to disembowel someone, his picking up of the club, the striking of Glenn with the club, the corroborating bruises on Glenn's body, the backing up of Glenn when he ran into Clarence knocking him down; Glenn's statement that he struck Bolden but once with the club which he had taken from Bolden, corroborated by the single cut, gash, or incision on Bolden's head, Bolden's knife lying on the ground near his body after the affray. All this evidence tends to sustain the appellant's contention that Bolden was the aggressor and that Glenn struck in self-defense, and that the reputation testimony should have been admitted.

The defense of self-defense was made in the opening statement of appellant to the jury in the contention that Bolden was a quarrelsome, violent man. It was made known to the court

and the prosecution in the judge's chambers when appellant's attorney stated that the reputation testimony was offered and was admissible because no crime had been committed. Glenn's having admitted the homicide, the statement that no crime was committed meant but one thing, and that was that the killing was justifiable, was in self-defense. The State then knew that about sixty days previously Glenn had asserted and introduced evidence of self-defense in his own trial. But whether expressly asserted or not, the evidence itself showed that self-defense was an issue, and that the appellant was entitled to corroborate testimony of hostile acts of aggression by showing that deceased's reputation and character were such as to show the probability of their occurrence.

The State objected to the testimony of Bolden's bad reputation because it claimed it was not shown that Glenn knew about it. This may be true as related to Glenn's apprehension, but it is immaterial as bearing upon the fact as to which was the aggressor, and as tending to corroborate other testimony relative to the assault. On that issue it is not different from the rule as to uncommunicated threats. It is the *fact* of the deceased's character and reputation as to this trait, and not the accused's knowledge of it, that is important and material. As Wigmore said:

"* * * this additional element of communication is unnecessary; for the question is what deceased probably did, not what the defendant probably thought the deceased was going to do The inquiry is one of objective occurrence, not of subjective belief." Wigmore on Evidence, Third Ed., section 63.

However, Glenn's experiences with Bolden in the Rogers home, and what Bolden said and did there, gave him some knowledge of Bolden's aggressive disposition. See, also, Cain v. Skillin, 219 Ala. 228, 121 So. 521, 64 A. L. R. 1022 et seq., and annotation; State v. Beird, supra, 118 Iowa 474–482, 92 N. W. 694.

The admission of this testimony was especially important to the appellant, and for that reason its rejection was especially prejudicial to him. For if the homicide was justifiable because Glenn struck in self-defense, no crime was committed, and Glenn was guilty of none. Necessarily, the appellant, who, the State

charges aided and abetted Glenn, could be guilty of no crime in so doing. There is no question in law or logic on this point. See State v. Clarence Wilson, supra, 235 Iowa 538, 544, 17 N. W. 2d 138, 142, and authorities cited; State v. Phillips & Ross, 24 Mo. 475; Pizana v. State, 81 Tex. Cr. Rep. 81, 193 S. W. 671; 29 C. J., Homicide, section 44; 40 C. J. S., Homicide, section 9; Harper v. State, 83 Miss. 402, 35 So. 572; Davis v. State, 107 Tex. Cr. Rep. 315, 296 S. W. 895, 896.

In State v. Leeper, 199 Iowa 432, 442, 443, 200 N. W. 732, 736, the defendant was tried for aiding and abetting Mrs. Wertz to commit the murder. In reversing a judgment of conviction, the court said:

"She testified that she fired the fatal shot. The court correctly instructed, in substance, that, if the jury found that Mrs. Wertz killed the deceased, *it must be further established beyond a reasonable doubt that she did not do so in justifiable self-defense, before the appellant could be convicted as an aider and abettor.*" (Italics ours.)

If there should be a retrial of this case, and the jury should find that Glenn Wilson killed the deceased in self-defense, it would be the duty of the jury to acquit this appellant.

II. The fact that, subsequent to the trial of appellant, Glenn was acquitted of the killing of Bolden on his defense of self-defense has been called to the attention of the court on this appeal and has been commented on by both sides. Appellant states that because thereof this appellant has been adjudicated not guilty and that the State should make application for a reversal of the judgment against appellant. The contention of appellant as to the adjudication has been urged by others and there is an interesting discussion of that view in the dissenting opinion in Roberts v. People, 103 Colo. 250, 87 P. 2d 251, 258–260, but the law is to the contrary, as held by this court in State v. Clarence Wilson, supra, 235 Iowa 538, 541, 17 N. W. 2d 138, 140, 141. Many authorities support the rule that, where a principal in the first degree and a principal in the second degree in the same offense have separate trials, the judgment against one, whether of conviction or of acquittal, has no bearing upon a judgment against the other. See authorities cited in State

v. Clarence Wilson, supra; also, People v. Frye, 248 Mich. 678. 227 N. W. 748; State v. Gifford, 19 Wash. 464, 53 P. 709; Maughon v. State, 9 Ga. App. 559, 71 S. E. 922, 924; Reed v. Commonwealth, 125 Ky. 126, 100 S. W. 856, 30 Ky. L. Rep. 1212; State v. Martino, 27 N. M. 1, 192 P. 507, 508, 509; Rooney v. United States, 9 Cir., Or., 203 F. 928. The judgment acquitting Glenn is neither res judicata in bar of the prosecution of Albert nor is it an estoppel to relitigating the issue of Glenn's self-defense. Kunkel v. Eastern Iowa Power & L. Co., 232 Iowa 649, 656 et seq., 5 N. W. 2d 899.

However, the doctrine of res judicata springs out of and is founded upon the principles of estoppel. It rests upon the principle of public policy that there should be an end to litigation of a question to which a public tribunal has once furnished an answer. The ancient maxim is, "Interest reipublicae ut sit finis litium."

Because of our holding on the first assigned error there is no necessity of ruling on the second one.

The judgment is reversed.—Reversed.

HALE, C. J., and GARFIELD, OLIVER, MULRONEY, and WENNERSTRUM, JJ., concur.